IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL ACTION NO. |
| LENARD ROY GIBBS, | 1:17-CR-207-CAP-CMS |
| Defendant. | |

## FINAL REPORT AND RECOMMENDATION

On August 15, 2017, a grand jury sitting in the Northern District of Georgia returned a seven-count Superseding Indictment against Defendant Lenard Roy Gibbs and his three alleged accomplices—Bernita Alveranga, Kyrie Campbell, and Miles Butler.  Defendant is charged with Hobbs Act robbery and brandishing a firearm during a crime of violence related to the November 3, 2016 robbery of a LoanMax in Norcross, Georgia (Counts One and Two); bank robbery and brandishing a firearm during a crime of violence related to the November 3, 2016 robbery of a PNC Bank in Lilburn, Georgia (Counts Three and Four); bank robbery and brandishing a firearm during a crime of violence related to the November 28, 2016 robbery of a People's Bank in Conyers, Georgia (Counts Five and Six); and being a felon in possession of a firearm on December 2, 2016, the date he was arrested (Count Seven).

Defendant has filed a number of motions, eleven of which are presently before the Court:

1. Motion to Suppress Evidence Seized During Warrantless Searches of His Residence and His Vehicle [Doc. 22]

2. Amended Motion to Suppress Evidence Seized During the Warrantless Search of the Saturn Vehicle He Was Driving at the Time of His Arrest [Doc. 35]

3. Amended Motion to Suppress Evidence Seized During the Warrantless Search of 396 Westwood Place, Apartment 6, Austell, Georgia [Doc. 36]

4. Motion to Suppress Evidence Seized As a Result of His Warrantless Arrest or in Connection with an Invalid Arrest Warrant [Doc. 41]

5. Amended Motion to Exclude Out-of-Court and In-Court Eyewitness Identifications, Request for Hearing, and Request for *Brady* Material [Doc. 106]

6-9. Motions to exclude identifications by Benita Alveranga [Doc. 119], Kyrie Campbell [Doc. 127], Miles Butler [Doc. 128], and United States Probation Officer Jason Griffith [Doc. 136]

10. Motion to Dismiss Counts Two, Four, and Six [Doc. 152]

11. Renewed Motion to Suppress Cell Site Data and Other Evidence Collected Pursuant to the Stored Communications Act [Doc. 164]

I have organized these motions into four groups: (1) the motions to suppress related to Defendant's arrest, the search of the car, and the search of the apartment [Docs. 22, 35, 36, 41]; (2) the motions to suppress related to the five identifications [Docs. 106, 119, 127, 128, 136]; (3) the Motion to Dismiss Counts Two, Four, and

Six [Doc. 152]; and (4) the Renewed Motion to Suppress Cell Site Data and Other

Evidence Collected Pursuant to the Stored Communications Act [Doc. 164].

# I.   <u>BACKGROUND</u>[1]

On March 15, 2018, I held an evidentiary hearing on Defendant's claim that

he was unlawfully arrested, and on his challenges to the warrantless searches of the

car he was driving at the time of his arrest and of his girlfriend's apartment.  [Docs.

22, 35, 36, 41].   At that hearing, the Government called six witnesses, and

Defendant called one witness.  [Doc. 135 at 173–74].  A transcript was prepared,

and the testimony is summarized below.  [Doc. 135].

## A.   What Law Enforcement Knew at the Time of the Arrest

At the time of his arrest on December 2, 2016, Defendant was suspected of

having committed three armed robberies, and multiple jurisdictions were engaged

in active investigations.  Officers from the City of Lilburn were investigating the

PNC Bank robbery, the Gwinnett County Police Department was investigating the

---

[1]  The facts in this section provide a general overview of the case and relate to Defendant's arrest and the two searches.  Additional facts relevant to the other motions are discussed later in this Report and Recommendation.  The evidence was presented on three days, and three transcripts have been filed.  [Docs. 135, 159, 166].  The page numbers on the transcripts continue sequentially from one hearing to the next, but the transcripts are filed under different CM/ECF numbers.  I have elected to cite to the CM/ECF document and page numbers printed on the top header of each transcript, rather than to the page numbers placed on the transcript by the court reporter, to make it easier to locate the testimony.

LoanMax robbery, and the City of Conyers Police Department was investigating the People's Bank robbery.  Special Agents from the FBI were also investigating the robberies.

The Government presented evidence that a PNC Bank in Lilburn, Georgia was robbed on November 3, 2016, and that the robber made away with more than three thousand dollars.  [Doc. 132-1 at 8 (Gov. Ex. 10)].  Apparently, the stolen money had a GPS tracker implanted within it, which allowed law enforcement to quickly identify the car carrying the money.  [Doc. 135 at 132].  Immediately after the robbery, law enforcement fell in behind the car, at which point the car sped up.  After a brief chase, the car stopped, and two male occupants fled on foot, leaving a female passenger in the car.   [Id.].   One of the males, co-defendant Kyrie Campbell, was captured at the scene and arrested.  The woman left behind in the car, co-defendant Benita Alveranga, was also arrested at that time.  Both Campbell and Alveranga gave interviews to law enforcement that day.  Campbell identified Defendant by name and by photograph and stated that he (Campbell) had driven Defendant to the bank and away from the bank after the robbery.  [Doc. 159 at 34–42, 53–59].  Alveranga did not identify Defendant by name but told the officers that the robber was the third person in the car, the person who had fled on foot and

4

not been captured.  [Id. at 63–65, 68–69; Doc. 142-1 at 10 (Gov. Ex. 12); Doc. 142-1 at 11 (Gov. Ex. 13)].

After Defendant was identified as a suspect in the PNC Bank robbery, Lilburn police officers contacted Detective Michael Baker of the Gwinnett County Police Department and advised him that the person who robbed the PNC Bank might be the same person that had robbed a LoanMax in Norcross, Georgia on the same day, because there were similarities between the two robberies.   After learning this information, Detective Baker followed up on the lead by, among other things, contacting Defendant's federal probation officer and asking the officer to review video and audio recordings from the LoanMax robbery to see if he thought Defendant was the robber.  [Doc. 135 at 140–41].  The probation officer positively identified Defendant by his voice.  [Id.].

A few weeks later, the robber hit again.   He robbed a People's Bank in Conyers, Georgia on November 28, 2016.   Eyewitnesses had seen the robber flee on the back of a motorcycle driven by a second suspect.   That suspect, co-defendant Miles Butler, was arrested shortly thereafter.  [Doc. 135 at 33–34].  On December 1, 2016, Butler was questioned by law enforcement, and he admitted to participating in the robbery.  He also identified Defendant—both by name and by

photograph—as the person who committed the robbery.  [Id. at 31, 34; Doc. 159 at 71–79; Doc. 142-1 at 14 (Gov. Ex. 17)].

Later in the evening on December 1, 2016, the news media aired coverage of the People's Bank robbery.  [Doc. 135 at 34].  Within hours, law enforcement received an anonymous tip that was later revealed to have been made by Defendant's pregnant girlfriend, Stacy Redwine.  [Id. at 17, 35, 102, 160].  In the tip, Redwine stated that Defendant was the robber, that he frequented the Westwood apartment complex in Austell, Georgia, and that he might be found driving a dark-colored Saturn.  [Id. at 16–17, 35, 98, 160].  The tip also included Defendant's date of birth and physical description.  [Id. at 35].

The Government presented evidence regarding several warrants for Defendant's arrest.  One was issued on November 4, 2016 for the PNC Bank robbery, and another was issued for the People's Bank robbery shortly before Defendant was arrested.[2]

---

[2]  A warrant based on the LoanMax robbery was also issued on the date Defendant was arrested, but it is unclear from the record whether it was obtained before Defendant's arrest and, if so, whether the other officers knew about it.  I have not relied on that warrant for that reason and because there are problems with the testimony offered by the Government concerning that LoanMax warrant.  The affiant for the warrant, Detective Baker, testified at the evidentiary hearing that in seeking the warrant, he orally advised the judge that an eyewitness had positively identified Defendant as the robber based on a photograph array.  [Doc. 135 at 140].

With respect to the warrant for Defendant's arrest issued on November 4, 2016, by Kenneth A. Parker, a judge in the Magistrate Court of Gwinnett County, related to the PNC Bank robbery, the Government called Cody Belcher, a detective with the City of Lilburn Police Department, who was the affiant for an arrest warrant. [Doc. 135 at 126–28; Doc. 132-1 at 8 (Gov. Ex. 10)]. Detective Belcher testified that he gave Judge Parker a brief summary of the case, i.e., that immediately after the PNC Bank was robbed, law enforcement identified the vehicle carrying the stolen money using a GPS tracker implanted in the money; that the car carrying the money sped up after law enforcement fell in behind it; that after a brief chase, the car stopped and two male occupants fled on foot, leaving a

---

On cross examination, however, Detective Baker admitted that the identification to which he was referring (that made by "C.C.") did not occur until 3:23 p.m. on December 2, 2016, three hours after the arrest warrant was issued. [Id. at 146; Doc. 133-1 at 3 (Gov. Ex. 5)]. At the time the officers obtained the LoanMax warrant, they had conducted only one photographic lineup with a LoanMax robbery victim ("H.C."), and it resulted in a "no i.d." conclusion. [Doc. 133-1 at 1 (Gov. Ex. 4)]. On cross-examination, Detective Baker admitted that at the time he secured the warrant, no one had picked Defendant out of a photographic lineup. [Doc. 135 at 147–49]. Additionally, there are no facts in the warrant to explain why law enforcement believed that Defendant was the robber [Doc. 132-1 at 9 (Gov. Ex. 11)], and there is no evidence that Detective Baker provided his probable cause facts to the judge under oath. Accordingly, I have not relied on the LoanMax warrant as a basis for Defendant's arrest.

female in the car; that one of the males, co-defendant Kyrie Campbell,[3] was

captured at the scene and arrested; that the woman left in the car, co-defendant

Benita Alveranga, was also arrested at that time; and that both Campbell and

Alveranga gave oral statements indicating that Defendant was the person who had

robbed the PNC Bank and that Defendant was the third person in the car who

escaped on foot.  [Doc. 135 at 129–33].  The warrant states:

> The facts of this affidavit for arrest are based on: said accused did
> with the intent to commit theft, take $3,139.00, the property of PNC
> Bank from the person of the victim by use of an offensive weapon to
> wit: weapon by pointing a silver and black firearm at the bank
> employee and demanding money.

[Doc. 132-1 at 8 (Gov. Ex. 10)].  There are no facts in the warrant regarding any

identifications made by Campbell or Alveranga, or anything else to explain why

law enforcement believed that Defendant was the robber.  [Id.].

Detective Belcher testified that it is a common practice for the factual basis

for Gwinnett County arrest warrants to be presented orally to the judge and not be

written down.  [Doc. 135 at 127–31].  During his testimony, Detective Belcher did

not state whether he provided the information to the judge under oath.  On cross-

---

[3]   At one point in his testimony, Detective Belcher referred to Kyrie
Campbell as "Kyrie Gibbs."  [Doc. 135 at 128].  Defendant does not make much of
this statement, and it appears that Detective Belcher simply misspoke when he
referred to "Kyrie Gibbs."

8

examination, Detective Belcher admitted that Alveranga did not identify Defendant by name, but only by photograph. [Id. at 133–35]. Detective Belcher testified that after he obtained the warrant, he informed FBI Special Agent Ashton Charles about it. [Id. at 130].

The Government also presented evidence that the City of Conyers Police Department obtained a warrant just prior to Defendant's arrest for the People's Bank robbery. Although the affiant, Corporal M. Vaughn, did not testify at the evidentiary hearing, another officer, Sergeant Kimberly Lucas, testified that in December 2016, she was investigating the November 28, 2016 People's Bank robbery. [Doc. 135 at 15, 17, 32–33]. She testified that on the date the warrant was issued, December 2, 2016, she and her investigation team, including Corporal Vaughn, knew that co-defendant Miles Butler had admitted to being the getaway driver, and that he had identified Defendant—both by name and by photograph— as the person who had committed the robbery. [Id. at 31, 34]. Sergeant Lucas also testified that her team was aware of the anonymous tip identifying Defendant as the People's Bank robber. [Id. at 15, 17, 28–30, 39]. The warrant states:

> Lenard Gibbs did enter People's Bank, leap over the teller counter and take possession of monies belonging to People's bank, from the presence of [K.S.] by threat of violence while brandishing what appeared to be a semi automatic handgun.

9

[Doc. 132-1 at 4–5 (Gov. Ex. 4)].  There are no facts in the warrant to explain why law enforcement believed that Defendant was the robber.  [Id.].  The warrant does not mention Butler's confession, Butler's identification of Defendant, or the anonymous tip.  [Doc. 135 at 40–41; Doc. 132-1 at 4–5 (Gov. Ex. 4)].  Although there is no indication on the warrant to reflect what time it was issued, Sergeant Lucas testified that her officers obtained the warrant before Defendant was arrested.  [Doc. 135 at 30, 39–40; Doc. 132-1 at 4–5 (Gov. Ex. 4)].  Sergeant Lucas testified that Corporal Vaughn was part of the investigation team and was fully aware of all the facts that led law enforcement to believe that Defendant was the People's Bank robber, including the fact that Butler had named Defendant as the robber.  [Doc. 135 at 30–31, 35].  Sergeant Lucas testified that it is common practice in Rockdale County for the affiant to provide "verbal probable cause" to the judge.  [Id. at 32, 41].  The Government, however, presented no evidence that the "verbal probable cause" for this particular warrant was sworn or otherwise provided to the judge under oath.

## B.  Surveillance and Arrest of Defendant

Sergeant Lucas testified further that the tipster had also advised them that Defendant frequented the Westwood apartment complex in Austell, Georgia, and that he might be found driving a dark-colored Saturn.  [Doc. 135 at 16–17, 35, 98,

160].  The tip also included Defendant's date of birth and physical description.  [Id. at 35].  At approximately 11:30 a.m. on December 2, 2016, the day after law enforcement received the tip regarding Defendant's whereabouts, Sergeant Lucas and her partner set up surveillance at the Westwood apartment complex in a white van.  [Id. at 16, 40].  FBI Special Agents Ashton Charles and Dayne Henriques were also part of the surveillance team and were present at the complex in a separate, unmarked car.  [Id. at 16, 40, 98–99].  According to Sergeant Lucas, the purpose of the surveillance was to see if Defendant was at the apartment and, if so, to arrest him.  [Id. at 43].  While Sergeant Lucas was conducting the surveillance, Corporal Vaughn advised her that he had obtained a warrant for Defendant's arrest.  [Id. at 30, 39–40; Doc. 132-1 at 4–5 (Gov. Ex. 4)].

At around 1:00 p.m. that day, Sergeant Lucas was advised by Special Agent Charles that Defendant and a woman were leaving the apartment; she then saw Defendant and a woman get into a dark-colored Saturn.  Defendant got into the driver's side of the car.  [Doc. 135 at 17].  When the Saturn pulled out, the FBI agents followed the Saturn in their unmarked car, and then Sergeant Lucas and her partner fell in behind them in the van.  [Id. at 17–18, 21, 44–45, 100].

At that point, Sergeant Lucas requested that the Cobb County Police Department assist them by stopping the Saturn and arresting Defendant.  [Doc. 135

at 19]. Sergeant Lucas testified that she advised the Cobb County Police Department that there were active bank robbery warrants for the driver who was a convicted felon and known to be armed and dangerous. [Id. at 19, 45–48]. From this point on, Sergeant Lucas was in phone contact with both FBI Special Agent Charles and with Sergeant Latham of the Cobb County Police Department. [Id. at 20, 46–47]. According to Special Agent Henriques, who also testified at the hearing, the FBI Special Agents followed the Saturn until they missed an exit and lost visual contact with the Saturn. [Id. at 100–01]. Sergeant Lucas and her partner, however, remained behind the Saturn. [Id. at 20].

A few minutes after Sergeant Lucas requested assistance, Cobb County Police Department officers, including Officer John Moore, arrived. [Doc. 135 at 21, 57–87]. Officer Moore testified that on December 2, 2016, he received a radio call on his private channel from his supervisor, Sergeant Latham. [Id. at 58, 73–74]. Sergeant Latham told him that there were state and federal law enforcement officers following a serial bank robbery suspect and that there was a possibility that the suspect would be coming into Cobb County. [Id. at 58]. Officer Moore was also advised that there were multiple warrants for the suspect, that the suspect was likely armed, and that there was a white van following the Saturn. [Id. at 59]. Officer Moore testified that he proceeded to the location where he expected the

12

suspect to be, at which time he saw a black Saturn pass by with a white van following it.  [Id. at 59–60].

Officer Moore then caught up to the Saturn and pulled directly behind it, got on the main channel, advised the dispatcher that he had visual contact with the Saturn, and requested backup in order to do a felony stop.  [Doc. 135 at 60–61]. Two other units fell in behind Officer Moore, at which point Officer Moore activated his blue lights.  The Saturn turned onto a road that led to an apartment complex.  [Id. at 61].

Upon entering the complex, the Saturn sped up and went over several speed bumps at a high rate of speed.  [Doc. 135 at 63].  Officer Moore followed the Saturn through the complex and then initiated a "pit maneuver," which he described as a "precision immobilization technique" whereby the officer taps the bumper of the car, causing the suspect's car to turn sideways and slide.  [Id. at 64]. Officer Moore testified that as a result of the pit maneuver, the Saturn came to a stop, having blown a tire, and Officer Moore's patrol car struck the Saturn's driver-side door.  [Id. at 64–65].  Officer Moore testified that the driver then climbed over the female passenger (later identified as Stacy Redwine, Defendant's girlfriend),

13

jumped out of the passenger-side door, and ran away.[4]  [Id. at 65].  Officer Moore

testified that he pursued the suspect until the suspect climbed a fence that Officer

Moore could not climb due to a shoulder injury that he sustained during the chase.

[Id. at 65–67].

Jordan Calliero, a uniformed patrol officer with the Cobb County Police

Department, testified that he was tasked with helping to set up a perimeter to cut

off routes of escape.  [Doc. 135 at 88–89].  According to Officer Calliero, K-9

officers had apprehended the suspect behind a house, and the officers brought

Defendant out toward Officer Calliero's patrol car.  The officers handed Defendant

over to Officer Calliero, who conducted a pat down and search for weapons.  [Id.

at 89–90].  During the search, Officer Calliero found a loaded handgun in a leather

inside-the-waistband holster.  [Id. at 90–91].  He also found marijuana and other

---

[4]   This version of events was confirmed by Redwine, whom Defendant
called as a witness at the evidentiary hearing.  She testified that on December 2,
2016, she and Defendant left her apartment and realized that they were being
followed.  [Doc. 135 at 152–55].  At some point, Cobb County Police Department
vehicles were behind them, and Defendant became nervous "because now we in
the car, and he has the weapons, and knowing he's on probation he was like I don't
want to go to jail if something happens, blah, blah, blah."  [Id. at 155].  Redwine
testified that she told Defendant to just pull over, but instead a "chase began
through the apartment complex."  [Id. at 155–56].  According to Redwine, her car
was then hit from the back, and it spun around; there was also a crash in the driver-
side door, and Defendant could not get out from that side.  [Id. at 156].  Defendant
then jumped over her and exited the vehicle from the passenger-side door, at which
time one of Defendant's guns fell to the ground, and he took off running.  [Id.].

drugs during the search. [Id. at 91]. A video showing the pat down that Officer Calliero conducted was admitted into evidence. [Id. at 92–93; Gov. Ex. 7].

The female passenger did not flee and later identified herself to Sergeant Lucas as Stacy Redwine. Redwine, who was pregnant at the time, was placed in the back of a patrol car; initially she was in handcuffs, but the handcuffs were later removed. [Doc. 135 at 24–26, 51–52; Doc. 159 at 62–63]. Redwine told Sergeant Lucas that the driver of the car who had fled was Defendant and that she thought he might go back to her apartment at the Westwood apartment complex, which backed up to the apartments where the Saturn had been abandoned. [Id. at 22, 24–25, 52]. Sergeant Lucas testified that she observed a large handgun on the asphalt next to the Saturn. [Id. at 23].

## C.    Search of the Car and the Apartment

Redwine testified that when she was discovered in the Saturn, an officer pulled his gun on her and told her to get on the ground. [Doc. 135 at 156]. She was then handcuffed and placed in the back of a patrol car. [Id. at 156–57]. She confirmed that the handcuffs were later removed. [Doc. 159 at 62–63].

Special Agent Henriques testified that he spoke with Redwine while she was sitting in the back of a patrol car. He said that he wanted to verify the information that Redwine had given to the police when she made the anonymous tip regarding

Defendant the previous evening.  [Doc. 135 at 102].  He also told Redwine that they were going to search her car.  According to Special Agent Henriques, he told Redwine that she could either give the officers consent to search the car right then and her car would be returned to her, or they could tow the car, get a warrant, and search the car that way.  [Id. at 103].  Special Agent Henriques testified that Redwine opted to give consent, at which point the officers searched the car.  [Id. at 103–04].  He testified that he did not have a consent form available at the time because the forms were in his FBI vehicle which was at the arrest location with Special Agent Charles.  [Id. at 104].  Redwine contradicted this version of events, testifying that no one ever asked for her consent to search the car and that she did not give consent to search her car.  [Id. at 169].

Redwine testified that at some point later, the officers asked her if she thought that Defendant might go back to her apartment, and she said yes.  [Doc. 135 at 157].  Redwine testified that the officers asked her if they could go look for Defendant at the apartment, and she said yes.  She testified that it was her understanding that the officers were going to the apartment for the sole purpose of searching for Defendant.  [Id. at 157–58].

Special Agent Henriques testified that he was the person who spoke with Redwine about searching the apartment, and that Redwine gave verbal consent to

16

search the apartment.  [Doc. 135 at 105–06].  He testified that because Special Agent Charles had returned with the FBI vehicle, Special Agent Henriques was able to retrieve a blank consent form from the vehicle, which Redwine signed, giving her written consent to search the apartment.  [Id. at 26–28, 52, 105–08]. The form is signed by Redwine, witnessed by Special Agent Henriques, and dated December 2, 2016.  It states in full:

1.    I have been asked by Special Agents of the Federal Bureau of Investigation to permit a complete search of: 396 Westwood Place, Apt. 6, Austell GA.

2.    I have been advised of my right to refuse consent.

3.    I give this permission voluntarily.

4.    I authorize these agents to take any items which they determine may be related to their investigation.

[Doc. 132-1 at 6 (Gov. Ex. 8)].  Redwine testified that although she recalled signing a document, she did not remember what the document said or whether anyone explained it to her; she did not know whether she was going to be arrested; although she wears glasses for reading, she was not wearing her glasses when she signed the form; and that she did not intend to allow the officers to search through her whole apartment.  [Doc. 135 at 158–59, 162, 166–68].  Redwine was later transported to a precinct for an interview, but she ultimately was not arrested.  [Id.

at 51, 55].   According to Redwine, when she got home several hours after the incident, the officers were still searching her apartment.  [Id. at 160].

Following the evidentiary hearing, Defendant filed a post-hearing brief regarding the arrest, the search of the car, and the search of the apartment.  [Doc. 177].  The Government responded [Doc. 184], and Defendant filed a consolidated reply brief [Doc. 188].

## II.   DISCUSSION

### A.   Motions to Suppress Related to Defendant's Arrest, Search of Car, and Search of Apartment [Docs. 22, 35, 36, 41]

With respect to his claim that his arrest was unlawful, Defendant argues that the warrants were invalid because they do not provide sufficient information to support a finding of probable cause that Defendant committed any crime, and that the Government produced no evidence that any of the statements made to the various judges who issued the warrants were sworn or otherwise made under oath. [Doc. 188 at 5–6].  Defendant next argues that the search of the Saturn was illegal based on Redwine's testimony that officers never asked her for consent to search her vehicle.  [Doc. 177 at 8].  Finally, as for the search of the apartment, Defendant argues that Redwine's consent was invalid because (1) the officers misled her into believing that they were going to search only for Defendant, when in reality they intended "to conduct a general rummaging through the apartment"; (2) Redwine

18

did not have authority to consent to the search because the apartment's lease was not in her name; and (3) she did not have the capacity to consent because she was illegally detained at the time.  [Id. at 7–8].

### 1.    Motion to Suppress Based on Illegal Arrest [Doc. 41]

Defendant argues that his arrest was illegal because the warrants were invalid.  [Doc. 177 at 4–6].  In response, the Government argues that the Court need not reach the issue of whether the warrants were valid, because even if there were no valid arrest warrants for Defendant (which the Government does not concede), the facts and circumstances within the collective knowledge of law enforcement at the time of the arrest were more than sufficient to establish probable cause to believe that Defendant committed one or more armed robberies.[5]  [Doc. 184 at 14–17].  I agree.

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures," and an arrest is considered a "seizure" of the person.  See United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009).  The "reasonableness" of an arrest is determined by the presence or absence of probable

---

[5]  The Government also argues alternatively that (1) the arrest was based on constitutionally valid arrest warrants, and (2) even if the warrants suffered some facial infirmity, the Leon good faith exception to the exclusionary rule applies.  [Doc. 184 at 7–14].  In light of my conclusion that the arrest was valid even in the absence of any arrest warrant, I need not address these arguments.

cause for the arrest.   "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." United States v. Floyd, 281 F.3d 1346, 1348 (11th Cir. 2002) (per curiam) (internal quotation marks omitted).   This probable cause standard is practical and non-technical, applied in a specific factual context and evaluated using the totality of the circumstances.   See Maryland v. Pringle, 540 U.S. 366, 370 (2003).   "Probable cause exists where the facts and circumstances within the collective knowledge of law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed."   United States v. Willis, 759 F.2d 1486, 1494 (11th Cir. 1985) (internal quotation marks omitted).   In order for the knowledge of the group to be imputed to the officer who conducts the stop or who makes the arrest, the Government must show that the officer "maintained at least a minimal level of communication during [the] investigation." Id.

The evidence presented at the hearing reflects that, on the date of the arrest, the officers conducting the surveillance (Special Agent Charles, Special Agent Henriques, Sergeant Lucas, and Sergeant Lucas's partner) were aware that Kyrie Campbell had identified Defendant, both by name and by photograph, as the

person who robbed the PNC Bank in Lilburn. [Doc. 135 at 128]. And, they knew that Miles Butler had identified Defendant, both by name and by photograph, as the person who had robbed the People's Bank in Conyers. [Id. at 31; Doc. 142-1 at 15 (Gov. Ex. 18)]. The officers also had reason to believe that Defendant would be at the Westwood apartment complex based on information provided by Defendant's girlfriend via the hotline tip. [Doc. 135 at 17, 35, 160–61]. Special Agent Charles, Special Agent Henriques, Sergeant Lucas, and Sergeant Lucas's partner knew all of these things, personally witnessed Defendant leave the apartment, and were the ones who caused Defendant to be arrested. These facts and circumstances within those officers' knowledge were sufficient to warrant a reasonable belief that Defendant had committed one or more armed robberies. See United States v. Floyd, 281 F.3d 1346, 1348 (11th Cir. 2002) (per curiam) (internal quotation marks omitted). Moreover, the evidence shows that these four officers were actively involved in Defendant's arrest and were in direct contact with the Cobb County officers who made the stop.

The evidence also shows that the Cobb County officers who made the stop maintained at least a minimal level of communication with the FBI agents and with Sergeant Lucas. Sergeant Lucas testified that she informed the Cobb County Police Department that she and the FBI Special Agents were following an armed

21

bank robbery suspect who had active warrants, and this information was relayed to Cobb County officers, including Officer Moore.   [Doc. 135 at 28, 59].   The information provided to the Cobb County officers was sufficient to make those officers aware of the investigation and some of the facts giving rise to probable cause to conduct the arrest, which is sufficient under the case law.   See, e.g., United States v. Wilson, 894 F.2d 1245, 1254 (11th Cir. 1990) (the surveilling officers on the scene advised their supervisor that the defendant's car was moving, and the supervisor then instructed them to stop the vehicle); Willis, 759 F.2d at 1493 (arresting officer arrived on the scene, was "informed . . . of the events," and then arrested the suspects); United States v. Kapperman, 764 F.2d 786, 790 (11th Cir. 1985) (arresting officer in Georgia was part of the surveillance team and confirmed that the defendant was using a false name by speaking with law enforcement officers in Las Vegas); United States v. Hernandez, 17 F. Supp. 3d 1255, 1260 (N.D. Ga. 2014) (the officers "with knowledge of the investigation" directed another officer, who testified at the hearing that he was aware of the federal investigation, to make the traffic stop); United States v. Olmedo, 552 F. Supp. 2d 1347, 1352 (S.D. Fla. 2008) (concluding that the police officer who made the traffic stop had maintained "more than a minimal level of communication" with the rest of the team where the police officer was in direct contact with the

DEA agent supervising the investigation, and had been provided with specific, material details of the DEA's investigation prior to the stop). Viewing the totality of the circumstances, I conclude that there was probable cause to support a warrantless arrest of Defendant on the date in question. I therefore recommend that the motion to suppress based on the stop and arrest [Doc. 41] be DENIED.

### 2. Motion to Suppress Based on the Search of the Car [Docs. 22, 35]

The next issue is whether the search of the Saturn violated the Fourth Amendment's prohibition on unreasonable searches and seizures. A search conducted pursuant to consent is a recognized exception to the requirements of probable cause and a search warrant. See United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991). Where, as here, the Government claims that a warrantless search was done pursuant to consent, the Government bears the burden of proving that consent was given freely and voluntarily. See United States v. Hidalgo, 7 F. 3d 1566, 1571 (11th Cir. 1993). Here, the only evidence regarding consent is the testimony of the two people involved, Special Agent Henriques and Stacy Redwine, and that testimony is in conflict. [Doc. 135 at 103–04 (Henriques); Doc. 135 at 169 (Redwine)].

In their post-hearing briefings, neither party addresses the credibility issue or the conflict in the evidence. In his initial brief, Defendant simply ignores the

testimony of Special Agent Henriques, stating "Ms. Redwine testified that officers never asked for her consent to search her vehicle, [and the] government has provided no other valid basis for searching the vehicle." [Doc. 177 at 8]. In response, the Government argues that Defendant abandoned any expectation of privacy that he may have had in the Saturn when he fled from the car, and, alternatively, that Redwine consented to the search.[6] In his reply brief, Defendant acknowledges Special Agent Henriques's testimony regarding consent, but does not challenge his credibility. Rather, Defendant simply points out that there is no written documentation of the alleged verbal consent and alternatively argues that any consent Redwine may have given is invalid because she did not have "the capacity to provide knowing and voluntary consent when she was in police custody." [Doc. 188 at 15–16].

### a)   Standing: Abandonment of the Expectation of Privacy

To determine whether an individual may challenge a search, courts must decide "whether the individual maintains a legitimate expectation of privacy in the

---

[6] The Government also argues that Defendant does not have standing to contest the validity of the search because Defendant did not have a valid driver's license at the time of his arrest. [Doc. 184 at 18]. It is not necessary for me to address this argument in light of my conclusions that Defendant abandoned any expectation of privacy he might have had and that Redwine consented to the search.

object of the search." United States v. Hastamorir, 881 F.2d 1551, 1559 (11th Cir. 1989).  It is the defendant's burden to prove that he has a legitimate expectation of privacy in the place searched.  See United States v. Cooper, 203 F.3d 1279, 1283–84 (11th Cir. 2000).  Prior to the hearing, the Government conceded that Defendant had made out a prima facie showing of a legitimate expectation of privacy in the Saturn based on an affidavit Redwine had signed stating that she owned the Saturn and that she had given Defendant permission to drive it on the date in question. [Doc. 35-1; Doc. 133-1 at 6 (Def. Ex. 8); Doc. 135 at 3–4, 150].

Legitimate expectations of privacy, however, can be abandoned.  See United States v. McKennon, 814 F.2d 1539, 1545 (11th Cir. 1987).  The question of abandonment is one of intent that "can be inferred from words, acts and other objective facts."  Id. at 1546; see also United States v. Sparks, 806 F.3d 1323, 1342 (11th Cir. 2015) (this is an objective assessment "based primarily on the prior possessor's intent").  And "the issue of abandonment for Fourth Amendment standing purposes is not abandonment in the 'strict property-right sense'" but is evaluated applying a "'common sen[s]e approach[.]'"  Sparks, 806 F.3d at 1342 (citations omitted).  "[T]he critical inquiry is 'whether the person prejudiced by the search . . . voluntarily discarded, left behind, or otherwise *relinquished his interest in the property* in question so that he could no longer retain a reasonable

25

expectation of privacy with regard to it *at the time of the search*.'"  McKennon, 814 F.2d at 1546 (quoting United States v. Pirolli, 673 F.2d 1200, 1204 (11th Cir. 1982)) (emphasis in original).  In making this determination, "events that occurred after the abandonment may be considered by the court as evidence of the defendant's intent to abandon the property at the previous time." United States v. Winchester, 916 F.2d 601, 604 (11th Cir. 1990); accord United States v. Walker, 199 F. App'x 884, 886 (11th Cir. 2006).  While the defendant has the burden of establishing a legitimate expectation of privacy, the Government has the burden of proving abandonment.  See Walker, 199 F. App'x at 886 (citing United States v. Ramos, 12 F.3d 1019, 1023 (11th Cir. 1994)); United States v. Jefferson, 451 F. App'x 833, 834 (11th Cir. 2011).

In his reply brief, Defendant makes an unpersuasive and legally unsupported argument that he did not abandon his privacy interests, because even though he fled from the vehicle, Redwine—the car's owner—remained behind in the vehicle. [Doc. 188 at 16].  The Court is aware of no law to support this legal theory.  On the contrary, the law is well-settled that when a defendant flees on foot after the stop of a vehicle, he abandons his privacy interest in the vehicle.  See, e.g., United States v. Falsey, 566 F. App'x 864, 866–67 (11th Cir. 2014) (finding that the defendant abandoned his car when, "believing that he was being pursued by the

police, [he] sped into the parking lot of a business park and then sprinted into the woods, leaving his car unlocked with the key still inside of it" and concluding that the "'only conceivable purpose' for doing so was . . . to disassociate himself from the vehicle and the [items] that were in it");[10] Jefferson, 541 F. App'x at 834 (affirming district court's finding that the defendant abandoned his privacy interest in a vehicle when, after struggling with the patrol officer during a lawful traffic stop, he fled the scene on foot);[11] United States v. Edwards, 441 F.2d 749, 751–53 (5th Cir. 1971) (finding that the defendant's expectation of privacy in his car "came to an end when he abandoned his car to the police, on a public highway, with the engine running, keys in the ignition, lights on and fled on foot"); United States v. Gaines, No. CR410-260, 2011 WL 744658, at *3 (S.D. Ga. Jan. 19, 2011) (finding that the defendant "forfeited any reasonable expectation of privacy with respect to the vehicle and its contents by fleeing from the police officers and

---

[10] The court in Falsey cited to the decisions of a number of other courts of appeal also finding abandonment when a defendant left a vehicle either running or parked and unlocked and fled the police on foot. Id. at 867.

[11] See United States v. Jefferson, Crim. No. 1:09-CR-324-WSD-RGV, 2010 WL 3928049, at **5, 8 (N.D. Ga. May 25, 2010), report and recommendation adopted, 2010 WL 3927874, at *8 (N.D. Ga. Oct. 4, 2010). The magistrate judge in Jefferson also provided a lengthy list of decisions finding abandonment of a vehicle when a defendant fled leaving his vehicle. Id. at *8.

abandoning his car"), report and recommendation adopted, 2011 WL 740728 (S.D. Ga. Feb. 23, 2011).

It is evident that in this case, Defendant abandoned any reasonable expectation of privacy that he may have had in the Saturn when, after finding himself on the receiving end of a pit maneuver, he climbed over Redwine, jumped out of the passenger door, and fled on foot from police.  [Doc. 135 at 65–67, 156]. The fact that Redwine stayed with the vehicle is of no relevance to Defendant's privacy expectation.  While it is true that Redwine did not abandon her expectation of privacy in the car, it is equally true that Defendant did abandon his privacy expectations when he ran away.  Thus, Defendant does not have standing to challenge the search of the car, and the motion should be denied on this basis.

### b)    Voluntary Consent

Alternatively, even if Defendant had standing to challenge the search, the motion should still be denied because the evidence shows that Redwine consented to the search of her car.

"Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses."  United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002).  In weighing the

28

credibility of a witness, the court takes "into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand."  Id. at 750; see also United States v. Wein, No. CRIM. 05-317, 2006 WL 2128155, at *3 (W.D. Pa. July 27, 2006) (noting that "customary techniques to ascertain the credibility of the witnesses" included, but was "not limited to: appearance and conduct of each witness, the manner in which he testified, the character of the testimony given, his intelligence, motive, state of mind, and demeanor while on the stand").  And, unless the evidence "is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it," or unless the factfinder's determinations appear to be "'unbelievable," a reviewing court should accept those findings of fact.  See Ramirez-Chilel, 289 F.3d at 749.

Having evaluated the testimony of Special Agent Henriques and that of Redwine based on these guidelines, I find Special Agent Henriques's testimony regarding consent to search the Saturn credible, and Redwine's testimony not credible.  While it is true that there is no paper documentation of the consent, Special Agent Henriques provided an explanation for why he did not use a consent form, testifying that at the time Redwine consented to the search, he did not have the forms available to him.  The lack of any documentation of Redwine's consent

29

to search the car is not suspicious and does not undermine Special Agent Henriques's testimony, which is otherwise entirely credible.

With respect to Defendant's argument that Redwine did not have the capacity to provide knowing and voluntary consent when she was in police custody, Defendant has provided no case law to support his position. Nor does the evidence support it. Sergeant Lucas testified that although Redwine was initially handcuffed, the handcuffs were removed at the time she discussed consenting to the searches. [Doc. 135 at 26, 55]. Sergeant Lucas testified that it had been several minutes, perhaps as many as twenty minutes after the car came to a stop, before Redwine spoke with Special Agent Henriques, and by that time, Redwine had calmed down, was comfortable in the back seat, and seemed fine. [Id.]. Both Special Agent Henriques and Sergeant Lucas testified that Special Agent Henriques never raised his voice when speaking with Redwine. [Id. at 26, 102]. Although Redwine was detained for approximately one hour at the scene and then was taken to the station for further questioning, there is no evidence that she was ever told that she was under arrest, nor is there evidence that the police acted in an intimidating way in connection with obtaining consent. [Id. at 159]. Moreover, even if Redwine were under arrest at the time she gave consent, that fact alone would not invalidate the consent. See United States v. Edmondson, 791 F.2d 1512

30

(11th Cir. 1986) (upholding consent given to search an apartment following an illegal arrest).  I conclude that based on the totality of the circumstances, Special Agent Henriques obtained voluntary consent from Redwine to search the Saturn.

Because (1) Defendant abandoned any expectation of privacy in the car and therefore lacks standing to challenge the search of the car, and (2) I find that Redwine consented to the search, I recommend that the motion to suppress evidence based on an improper search of the car [Docs. 22, 35] be DENIED.

### 3.    Search of the Apartment [Docs 22, 36][7]

The next issue is whether the search of Redwine's apartment violated the Fourth Amendment's prohibition on unreasonable searches and seizures.  As with the search of the car, the Government contends that the search of the apartment was conducted pursuant to valid consent.  Defendant argues that Redwine was deceived into thinking that the officers were going to search only for Defendant, and that she was surprised to learn that the officers had conducted "a general rummaging through the apartment."  [Doc. 177 at 7].  This position, however, is

---

[7]  At the evidentiary hearing, the Government conceded that Defendant had sufficiently alleged standing to challenge the search of the apartment based on an affidavit signed by Redwine.  In that affidavit, Redwine stated that she and Defendant were staying at the apartment with the permission of her sister, the leaseholder, that Defendant stayed there one to two nights per week, and that on the night before the surveillance and arrest, Defendant had stayed in the apartment overnight.  [Doc. 135 at 3–4; 150; Doc. 133-1 at 5 (Def. Ex. 7)].

belied by the content of the consent form that Redwine signed.  Her signature reflects that she permitted law enforcement to conduct a "complete search" of the apartment and "to take any items which they determine may be related to their investigation."  [Doc. 132-1 at 6 (Gov. Ex. 8)].  Her testimony to the contrary at the hearing simply is not credible.

Although Redwine was detained for some time, there is no evidence that she was ever told she was under arrest or that anyone acted in an intimidating way toward her.  [Doc. 135 at 159].  Moreover, there is no evidence that Redwine was of below-average intelligence or otherwise unable to understand the document she signed.  The form specifically advised Redwine of her right to refuse consent, and Special Agent Henriques testified that he read the form to her, line-by-line.  [Doc. 153 at 105].  In the absence of any case law to support Defendant's argument, I see no basis for ruling that Redwine's detention for questioning in any way negated her consent or otherwise rendered her incapable of voluntarily consenting to the search of the apartment.

Finally, Defendant argues that because Redwine was not the leaseholder of the apartment, she was not able to provide valid consent to search the apartment. [Doc. 177 at 7].  This argument fails because who is named on the lease is just one of many factors that courts consider in determining the validity of consent.  "[A]

warrantless entry and search by law enforcement officers does not violate the Fourth Amendment's proscription of 'unreasonable searches and seizures' if the officers have obtained the consent of a third party who possesses common authority over the premises." Illinois v. Rodriguez, 497 U.S. 177, 179 (1990). Third parties may consent to searches when they possess "common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171 (1974). The Supreme Court has explained that:

> [t]he authority which justifies the third-party consent does not rest upon the law of property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

Id. at 172, n.7 (citations and internal quotation marks omitted). Moreover, "even if the consenting party does not, in fact, have the requisite relationship to the premises, there is no Fourth Amendment violation if an officer has an objectively reasonable, though mistaken, good-faith belief that he has obtained valid consent to search the area." United States v. Brazel, 102 F.3d 1120, 1148 (11th Cir. 1997).

In her affidavit submitted for purposes of establishing Defendant's standing to challenge the search of the apartment, Redwine averred that her sister, Regina

Armour, was the leaseholder for the apartment, but that she (Redwine) and Defendant "were staying in the apartment with her permission." [Doc. 133-1 at 5]. During her testimony, Redwine repeatedly referred to the apartment as the place where she (Redwine) lived. [Doc. 135 at 152 (describing the apartment as where she was living at the time of Defendant's arrest), 155 (referring to the apartment as "my apartment" and "where I live at")]. And, when she was asked at the hearing who was living at the apartment at the time she made the hotline tip, Redwine answered "my daughter; her two kids, they're toddlers; my daughter's boyfriend; my daughter's friend and her boyfriend was there." [Id. at 161]. Redwine does not identify Regina Armour—the person on the lease—as living in the apartment.

Here, evidence showed that there was both mutual use and joint access such that law enforcement could reasonably believe that Redwine had common authority over the apartment, within the meaning of Matlock, and therefore could consent to a warrantless search of it. The fact that Redwine's name was not on the lease did not divest her of her actual or apparent authority to consent to a search. See United States v. Camp, 157 F. App'x 121, 123 (11th Cir. 2005). Because law enforcement obtained voluntary consent to the search of the apartment, I recommend that the motion to suppress evidence based on an improper search of the apartment [Docs. 22, 36] be DENIED.

34

**B.   Motions to Suppress Related to Five Identifications [Docs. 106, 119, 127, 128, 136]**

Over the course of two days—April 2, 2018 and June 26, 2018—I held an evidentiary hearing on Defendant's challenges to five witness identifications. [Docs. 159, 166].  In total, the Government called five witnesses, and Defendant called one.  [Doc. 159 at 122; Doc. 166 at 81].  The standard for analyzing motions to suppress out-of-court identifications is as follows:

> Due process prohibits witnesses from testifying about out-of-court identifications when there is a very substantial likelihood of misidentification.  A violation of due process occurs when, under the totality of the circumstances, a confrontation procedure is unnecessarily suggestive and conducive to irreparable mistaken identification.   If the identification procedure was not unduly suggestive, then that ends the inquiry; the evidence may be admitted.

> If the procedures utilized were unduly suggestive, the court then considers whether, under the totality of the circumstances, the identification was nonetheless reliable.   Courts evaluate several factors to determine reliability: the opportunity of the witness to view the criminal, degree of attention, the accuracy of a prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.

> The defendant bears the burden of proving that the identification procedure used was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification, and only after the defendant meets this burden must the government show the identification was reliable independent of the suggestive procedure. Further, the Constitution does not require an evidentiary hearing in every case of a claimed improper identification.

<u>United States v. Mustafa</u>, Crim. No. 1:11-cr-0234-1-CAP, 2012 WL 1903255, at
*1–2 (N.D. Ga. May 25, 2012) (citations and internal quotation marks omitted).

1.      **Identification by C.C. [Doc. 106]**

Of the five identifications that Defendant challenges, C.C., a victim of the
LoanMax robbery, is the only one with whom Defendant was not previously
acquainted.[8]  Gwinnett County Police Officer Wesley Fitzpatrick testified that at
the request of Detective Baker, he conducted a photographic lineup on December
2, 2016 with C.C.  [Doc. 159 at 12].  A copy of the lineup was introduced into
evidence.  [Doc. 133-1 at 3 (Def. Ex. 5)].  Officer Fitzpatrick testified that he was
not involved in the investigation of the LoanMax robbery and did not know which
of the pictures was of the suspect.  [<u>Id.</u> at 13].

Officer Fitzpatrick testified that he read the photographic lineup affidavit to
C.C. and then showed her the photographs and asked her to choose the one that she

---

[8]     In the motion located at docket entry 106, Defendant also moved to
suppress any identifications of Defendant made by the second victim of the
LoanMax robbery, "H.C."  At the evidentiary hearing, the Government informed
the Court that H.C. did not identify Defendant and agreed that it would not seek to
introduce any identification testimony from that witness at trial.  [Doc. 159 at 7;
Doc. 133-1 at 1 (Def. Ex. 4)].  Given the Government's position, I recommend that
the portion of the motion regarding the identification by H.C. [Doc. 106] be
DENIED AS MOOT.  Also in that motion, Defendant moved to suppress any
identification related to Miles Butler based on the Government's failure to comply
with its discovery obligations.  [Doc. 106].  We discussed this issue at the hearing,
and I denied that portion of the motion.  [Doc. 159 at 47–51].

thought was the suspect.  [Doc. 159 at 13].  According to Officer Fitzpatrick, C.C. took her time, noted that the robber had something covering his face, and ultimately stated that based on the eyes, she believed that Number 5 (Defendant) was the person who had committed the LoanMax robbery.  [Id. at 14].  Officer Fitzpatrick asked C.C. if she was sure, and she said yes.  [Id. at 24–25].  Upon prompting from Detective Baker, C.C. stated that her confidence level was eight out of ten.  [Id. at 15, 24].  C.C. circled Number 5, wrote her initials at the bottom, and then both she and Officer Fitzpatrick signed the affidavit.  [Id. at 16–17; Doc. 133-1 at 3 (Def. Ex. 5)].   After C.C. had made her selection, Detective Baker instructed Officer Fitzgerald on how to fill out the form.  [Doc. 159 at 21, 24].  At the hearing, the parties agreed that Detective Baker is African-American, and that Officer Fitzpatrick is not.  [Doc. 166 at 7; Doc. 176 at 15, n.8].

Defendant called C.C. as a witness, who testified that two officers spoke with her after the robbery to see if she could identify the robber; one was white and the other was African-American.  [Doc. 166 at 69–71, 75–76].  C.C. testified that when she made the identification, it was the African-American officer (presumably Detective Baker) who interacted with her and that the white officer (presumably Officer Fitzpatrick) did not talk during the identification.  [Id. at 71, 76].

37

In his post-hearing brief, Defendant does not argue that the lineup was unduly suggestive. Rather, he argues only that C.C.'s identification of Defendant was not reliable. [Doc. 176 at 13–18]. The case law, however, makes clear that "[i]f the identification procedure was not unduly suggestive, then that ends the inquiry; the evidence may be admitted." Mustafa, 2012 WL 1903255, at *1–2 (citing Williams v. Weldon, 826 F.2d 1018, 1021 (11th Cir. 1987)). In deciding whether to suppress such evidence, courts should not consider reliability unless the procedures utilized were unduly suggestive. Although there is a conflict in the testimony as to whether it was Detective Baker or Officer Fitzpatrick who presented the photograph array to C.C., there is nothing to indicate that either the array or the procedures that the officers used were unduly suggestive. Thus, "the evidence may be admitted." Id. Accordingly, I recommend that the motion to suppress C.C.'s identification [Doc. 106] be DENIED.

### 2.    Identification by Kyrie Campbell [Doc. 127]

Officer Rebecca Turner, a patrol officer with the Lilburn Police Department, testified that on November 3, 2016, Kyrie Campbell was in custody at the police station following his capture immediately after the PNC Bank robbery. [Doc. 159 at 34]. She testified that she sat with Campbell and Sergeant Allen in the breakroom of the police station while they were waiting for an interview room to

open up, and Campbell was talking about his life and his music career. [Id.]. Officer Turner testified that while talking about Campbell's Youtube Channel, Campbell stated that Lenard Gibbs (Defendant) was the person who robbed the PNC Bank. [Id. at 34, 39].

According to Officer Turner, one of the investigators who was still out in the field, Lieutenant Dusik, had obtained Defendant's information, found Defendant's Facebook page, copied a picture from that page, and sent it to Lieutenant Allen, who was at the station with Officer Turner and Campbell. [Doc. 159 at 35, 112]. Officer Turner testified that Lieutenant Allen then showed the picture to Campbell, who identified the picture as being Defendant. [Id. at 35, 41, 112]. According to Officer Turner, this identification occurred after Campbell had first identified Defendant by name. [Id. at 36]. The Government was unable to locate this photograph.

After making that identification, Campbell then stated that he was Facebook friends with Defendant, and Campbell gave consent to the officers to look at Campbell's Facebook account. [Doc. 159 at 36–37, 42]. Officer Turner testified that she opened Facebook, searched for "Lenard Gibbs," found his profile, and screenshotted one of his photographs. [Id. at 37].

Later, FBI Special Agent Charles arrived at the Lilburn police station and conducted a recorded interview of Campbell, along with Lilburn Investigator Cody Belcher.  [Doc. 159 at 52].  Special Agent Charles testified that he read Campbell his <u>Miranda</u> rights, after which Campbell admitted that he was in the car with Defendant at the PNC Bank on the date of the robbery.  [<u>Id.</u> at 54–55].  Campbell told Special Agent Charles that he knew Defendant personally and was Facebook friends with him.  [<u>Id.</u> at 55].  Special Agent Charles testified that he showed Campbell two screenshots from the surveillance footage at the PNC Bank, and Campbell identified Defendant as the person depicted in both screenshots.  [<u>Id.</u> at 53, 57].  On one of the surveillance photographs, Campbell wrote: "Black shirt, pants, bookbag, black shoes, Lenard Gibson," and he signed his name.  [<u>Id.</u> at 58; Doc. 142-1 at 7 (Gov. Ex. 7)].  On the other surveillance photograph, Campbell wrote: "Black shirt, jeans, bookbag, this is Lenard Gibson," and he signed his name. [Doc. 159 at 59; Doc. 142-1 at 8 (Gov. Ex. 8)].  Special Agent Charles also showed Campbell a Facebook picture of Defendant, on which Campbell wrote "Lenard Gibson" and then signed his name.  [Doc. 159 at 59; Doc. 142-1 at 9 (Gov. Ex. 9)].  The pictures with Campbell's writing on them were admitted into evidence, along with portions of the audio and video recording of the Campbell interview in which he identified Defendant as the robber.  [Doc. 159 at 54, 56, 60;

40

Doc. 134 (minute entry admitting Gov. Exs. 5 & 6); Gov. Exs. 5 & 6; Doc. 142-1 at 7 (Gov. Ex. 7); Doc. 142-1 at 8 (Gov. Ex. 8); Doc. 142-1 at 9 (Gov. Ex. 9)]. Later, the full Campbell interview was admitted into evidence. [Doc. 166 at 63; Gov Ex. 23].

In his motion to suppress, Defendant argues that single-photo identifications, like the ones used here, are inherently unduly suggestive, and he relies on three facts to support his contention that Campbell's identification is unreliable.  First, Defendant states that the recording of the interview reveals that Campbell said "I'm just glad I looked at Facebook earlier because I didn't even remember his name.  At all."  Second, he complains that the first photograph shown to Campbell was never produced in discovery.  And third, Campbell refers to "Lenard Gibson," which is not Defendant's name.  [Doc. 176 at 5–6].

Binding precedent of this Circuit mandates a conclusion that the identification procedure employed in this case was unduly suggestive, because Campbell made his identification upon viewing a single photograph.  See United States v. Cueto, 611 F.2d 1056, 1063 (5th Cir. 1980) (procedure unduly suggestive where witness was shown one photograph of the defendant); Hudson v. Blackburn, 601 F.2d 785, 788 (5th Cir. 1979) (observing that "a single photograph display is one of the most suggestive methods of identification and is always to be viewed

with suspicion").  A single-picture photograph display, however, can nevertheless be admissible if the identification is otherwise reliable.  See Manson v. Brathwaite, 432 U.S. 98, 114–16 (1977); United States v. Cannington, 729 F.2d 702, 711 (11th Cir. 1984).  For an identification to be unconstitutionally unreliable, there must be a substantial risk of misidentification.  See United States v. Walls, 237 F. App'x 599, 601 (11th Cir. 2007).  There is no such risk in this case.

Here, Campbell told Officer Turner who the robber was before he was shown any photographs and before he was interviewed by Special Agent Charles. [Doc. 159 at 54–55].  The evidence presented at the evidentiary hearing shows that Campbell knew Defendant personally before the date of the offense and was Facebook friends with him.  [Id. at 55].  Campbell admitted during his interview that Defendant asked him for a ride to the bank and that Campbell drove Defendant to the bank.  [Gov. Ex. 23 at 11:39:39–11:39:51].  I agree with the Government that, as a co-defendant who has admitted to taking part in the robbery, Campbell's identification of Defendant is most reliable.  While Campbell may be lying about who the robber is, the chance of him simply making a mistake as to the robber's identity is very slight.

I have reviewed the audio of the interview (Government Exhibits 6 and 23), and I hear Campbell saying, "I'm just glad," but I do not hear the rest of what

42

Defendant says is on the statement (i.e., "I looked at Facebook earlier because I didn't even remember his name.  At all.").  And, neither the Government's failure to locate the first picture nor Campbell's reference to "Gibson" renders the identification unreliable when the rest of the evidence, particularly Campbell's personal relationship with Defendant, is considered.  Having considered the totality of the circumstances, I conclude that Campbell's identification is sufficiently reliable to allow the Government to present it to the jury.   Accordingly, I recommend that Defendant's motion to suppress the identification by Kyrie Campbell [Doc. 127] be DENIED.

### 3.      Identification by Benita Alveranga [Doc. 119]

Special Agent Charles testified that after interviewing Campbell, he and Detective Belcher interviewed Campbell's girlfriend, Benita Alveranga, who had also been arrested following the PNC Bank robbery.  [Doc. 159 at 62–63].  He testified that he showed Alveranga three photographs, one from Facebook and two screenshots from video surveillance footage at the PNC Bank robbery.  [Id. at 63–64; Doc. 142-1 at 10 (Gov. Ex. 12); Doc. 142-1 at 11 (Gov. Ex. 13); Doc. 142-1 at 12 (Gov. Ex. 14)].   Special Agent Charles testified that when looking at the surveillance photographs, Alveranga said "this was the guy from her vehicle," but that she could not identify the person in the Facebook photograph, and she did not

identify Defendant by name. [Doc. 159 at 65, 68]. On the two surveillance footage screenshots, Alveranga wrote "Man in vehicle" and signed her name; she did not write anything on the Facebook photograph. [Id. at 63–65, 69; Doc. 142-1 at 10 (Gov. Ex. 12); Doc. 142-1 at 11(Gov. Ex. 13)]. Portions of the audio and video recording of the Alveranga interview concerning Defendant were admitted into evidence [Doc. 159 at 66; Gov. Exs. 10, 11], and later the full Alveranga interview was admitted into evidence [Doc. 166 at 63; Gov Ex. 24].

In his post-hearing brief, Defendant makes no argument regarding this evidence, instead simply stating in a footnote, "The government has provided no reports, videos, audio files, statements or other documents suggesting that Benita Alveranga has ever identified Mr. Gibbs as a robbery suspect in this case." [Doc. 176 at 1, n.1]. While I agree with Defendant that Alveranga did not identify Defendant as the robber, I see no basis to exclude the evidence presented at the hearing, specifically that Alveranga believed that whoever robbed the PNC Bank was also the person who was in her car. Given Defendant's failure to provide any post-hearing argument on this issue, I recommend that Defendant's Motion to Exclude Out-of-Court and In-Court Identifications by Co-Defendant Benita Alveranga [Doc. 119] be DENIED AS MOOT.

4.      **Identification by Miles Butler [Doc. 128]**

On December 1, 2016, Special Agent Charles and Cory Hambrick of the Conyers Police Department interviewed Miles Butler, who they suspected of being the getaway motorcycle driver for the November 28, 2016 People's Bank robbery, at the Conyers Police Headquarters.  [Doc. 166 at 14–16; Doc. 159 at 69–71]. Both Special Agent Charles and Sergeant Hambrick testified that Butler identified Defendant by name (or at least by the nickname "D") before Butler was shown any photographs.  [Doc. 159 at 71, 73, 94; Doc. 166 at 21–22, 25–26, 32, 41].

According to Special Agent Charles, Butler admitted to being the getaway driver for the People's Bank robbery, and that early in the interview, Butler told them that Defendant was the robber.  [Doc. 159 at 71, 73, 94].  Butler also told the officers that he had picked up Defendant from the back of a funeral home, had driven around to scout out other banks, had driven Defendant to the People's Bank, and had driven Defendant away from the bank after the robbery back to the funeral home, at which point they split up.  [Id. at 77].

At that point, Butler was shown three photographs.  [Doc. 159 at 71, 79]. Butler was first shown a photograph of a motorcycle.  [Doc. 142-1 at 13 (Gov. Ex. 16)].  According to Special Agent Charles, Butler stated that he recognized the bike as his own and stated that he and "D" were riding on the bike.  [Doc. 150 at

45

78, 89].  Special Agent Charles testified that he was aware that Defendant used the alias "Danger" and "D."  [Doc. 159 at 79].  Butler wrote on that surveillance shot "Lenard Gibbs was riding my bike shotgun in the photograph," and he signed and dated it.  [Id. at 74; Doc. 166 at 22–23, 33; Doc. 142-1 at 14 (Gov. Ex. 17)]. Special Agent Charles testified that he showed Butler a second photograph, a picture of Defendant that had been pulled from Facebook, on which Butler wrote "Lenard Gibbs robbed the bank on 11/28/2016."  [Doc. 159 at 76-77; Doc. 142-1 at 15 (Gov. Ex. 18)].  Sergeant Hambrick testified that he showed Butler a third photograph, a surveillance shot showing the robber jumping over the counter at the People's Bank with a firearm in his hand.  [Id. at 26–27; Doc. 171-1 at 4 (Gov. Ex. 19)].  According to Sergeant Hambrick, Butler identified Defendant in the picture and wrote "I believe this is Lenard Gibbs" on the picture.  [Doc. 166 at 37–38; Doc. 171-1 at 4 (Gov. Ex. 19)].  Portions of the audio and video recording of the Butler interview concerning Defendant were admitted into evidence.  [Doc. 159 at 76; Gov. Ex. 15].  The Government later introduced the recordings of the full interview with Butler.  [Doc. 166 at 19; Gov. Exs. 20, 21].

In his post-hearing brief, Defendant argues that throughout the interview, Butler was looking to the officers for affirmation of his claims and was double-checking his words with them before writing on the photographs.  [Doc. 176 at 12].

The Court has reviewed the audio of this interview[9] and notes that Butler's answers were vague and confusing at times and that some of the questions were pointed. This does not change the fact, however, that Butler clearly admitted that he was previously acquainted with Defendant, that he had given Defendant rides on his motorcycle in the past, that he and Defendant had cased out banks on the day of the robbery, that he had driven Defendant to the People's Bank, and that he had driven Defendant away from the bank after the robbery.  [Doc. 166 at 2, 25, 34; Gov. Ex. 20 at 15:48:40, 16:05:46, 16:09:54, 16:11:56].   There is no evidence that Butler ever gave a description that was inconsistent with Defendant.  Given the two men's close prior relationship, the photographic identification is, by its very nature, reliable.   See United States v. Carter, No. 205CR67FTM29DNF, 2005 WL 3556050, at *1 (M.D. Fla. Dec. 28, 2005) (concluding that an identification of a defendant from a single photograph by a witness was reliable where the witness, a police officer, had made a hand-to-hand purchase of drugs from defendant on three separate occasions and had previously spoken to the defendant on the telephone). Accordingly, I recommend that Defendant's motion to suppress Butler's identification [Doc. 128] be DENIED.

---

[9] The Court was unable to view any video of this interview.

47

### 5.      Identification by Jason Griffith [Doc. 136]

Jason Griffith, a United States Probation Officer who supervised Defendant at the time of the robberies, also testified at the evidentiary hearing.  [Doc. 166 at 43–62].  Officer Griffith testified that he first met Defendant in October 2015 and that he served as Defendant's supervising officer until August 25, 2017, when Defendant's supervised release was revoked.  [Id. at 44].  During that time, he spoke with Defendant on the phone at least eleven times and met with Defendant face-to-face at least fourteen times.  [Id. at 45–46].  Officer Griffith testified that on November 3, 2016, he had received multiple "ATLAS hits" indicating that Defendant was suspected of robbery.  [Id. at 56].

He testified further that on November 21, 2016, Detective Baker contacted him and asked him to review video surveillance footage from the LoanMax robbery to see if Officer Griffith recognized Defendant as the robber.  [Doc. 166 at 47–48, 53–54].  Officer Griffith testified that after watching and listening to the video, he was "certain" that Defendant was the robber based on the robber's voice and because "the body frame was similar to [Defendant's] stature."  [Id. at 48–49; Gov. Ex. 22].  He noted that the video quality was "not great," but that the audio quality was "fantastic" and "crystal clear."  [Id. at 48].  In his motion to suppress,

Defendant argues that the procedure employed to obtain this voice identification is, by its very nature, unduly suggestive and unreliable.  [Doc. 176 at 23–25].

Voice identification testimony can be admitted only after it is determined that there is sufficient evidence to support a finding that "the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  A speaker's voice may be identified by opinion testimony "based on hearing the voice at any time under circumstances that connect it with the alleged speaker."  Id. 901(b)(5).  "Once a witness establishes familiarity with an identified voice, it is up to the jury to determine the weight to place on the witness's voice identification."  United States v. Cox, 544 F. App'x 908, 911–12 (11th Cir. 2013).

Here, Officer Griffith testified credibly at the hearing that he had spoken with Defendant on the phone at least eleven times, had met with Defendant face-to-face at least fourteen times, and that the two had had several lengthy conversations.  [Doc. 166 at 45–46].  This evidence is sufficient to show that Officer Griffith was familiar with Defendant's voice; it is up to the jury to decide the weight to place on his voice identification.  See Cox, 544 F. App'x at 912 (concluding that a witness's familiarity with a person from high school ten years earlier and from a fifteen to thirty minute conversation on the day of the arrest was sufficient to allow the jury to hear the identification evidence).  Accordingly, I

recommend that Defendant's motion to suppress Officer Griffith's identification [Doc. 136] be DENIED.

## C.      Motion to Dismiss Counts Two, Four, and Six [Doc. 152]

Defendant seeks to dismiss Counts Two, Four, and Six, the three counts alleging violations of 18 U.S.C. § 924(c).   That statute prescribes enhanced punishments for any person who uses, carries, possesses, brandishes, or discharges a firearm in relation to either a "crime of violence" or a drug trafficking crime.  See 18 U.S.C. § 924(c)(1).  The statute defines "crime of violence" as follows:

> (3) For purposes of this subsection the term "crime of violence" means an offense that is a felony and—
>
>> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>>
>> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3).  Thus, there are two alternative ways to define a crime of violence for purposes of § 924(c).  The definition in subsection (A) is referred to as the "use-of-force clause," and focuses on the specific elements of the offense.  The definition in subsection (B) is referred to as the "risk-of-force clause," and focuses on the "nature" of the crime and the potential risk that physical force may be used in committing the crime.  Id.

50

Defendant first argues that the definition set forth in subsection (B) is unconstitutionally vague based on the Supreme Court's recent decision in Sessions v. Dimaya. In Dimaya, the Supreme Court held that the risk-of-force clause of 18 U.S.C. § 16, as incorporated into the Immigration and Nationality Act's definition of the term "aggravated felony," is unconstitutionally vague. See Sessions v. Dimaya, 138 S. Ct. 1204, 1223 (2018). The language in the risk-of-force clause of 18 U.S.C. § 16 is identical to the language in the risk-of-force clause of 18 U.S.C. § 924(c). In Dimaya, the Supreme Court relied on its prior decision in Johnson v. United States, 135 S. Ct. 2551 (2015), in which the Supreme Court held that a similar (but not identical) phrase in the Armed Career Criminal Act was unconstitutionally vague. See Dimaya, 138 S.Ct. at 1213–23.

Defendant argues that the three § 924(c) counts against him should be dismissed based on the Supreme Court holdings in Dimaya and Johnson. [Doc. 152 at 2–7]. Just last week, however, the Eleventh Circuit rejected the precise argument that Defendant makes here. See Ovalles v. United States, No. 17-10172, 2018 WL 4830079 (11th Cir. Oct. 4, 2018). Moreover, the motion is due to be dismissed because the Eleventh Circuit has previously held that the predicate

offenses with which Defendant is charged are crimes of violence under subsection (A), the use-of-force clause.[10]

The predicate offense for Count Two is the Hobbs Act robbery of the LoanMax (an alleged violation of 18 U.S.C. § 1951(a)) that is charged in Count One of the Superseding Indictment. The Eleventh Circuit has held that Hobbs Act robbery "clearly qualifies as a 'crime of violence' under the use-of-force clause in § 924(c)(3)(A)." In re Saint Fleur, 824 F.3d 1337, 1340–41 (11th Cir. 2016). The predicate offense for Counts Four and Six are the two bank robberies (alleged violations of 18 U.S.C. § 2113(a) and (d)) that are charged in Counts Three and Five of the Superseding Indictment. The Eleventh Circuit has held that bank robbery, both with and without a gun, qualifies as a crime of violence under the use-of-force clause of § 924(c)(3)(A). See In re Sams, 830 F.3d 1234, 1239 (11th Cir. 2016); In re Hines, 824 F.3d 1334, 1337 (11th Cir. 2016). Defendant acknowledges these cases but argues that they were wrongly decided. [Doc. 183 at

---

[10]   Neither Dimaya nor Johnson called into question the soundness of the use-of-force clauses in any of the relevant statutes. See In re Gordon, No. 18-3449, 2018 WL 3954189, at *1 (6th Cir. Aug. 14, 2018) ("Even if the Supreme Court had announced that Dimaya applies to § 924(c)(3)(B), that rule has no effect on Gordon's case because his convictions for Hobbs Act robbery qualify as crimes of violence under § 924(c)(3)(A) as offenses having 'as an element the use, attempted use, or threatened use of physical force against the person or property of another.'").

4–5].  He also argues that the reasoning of the <u>In re St. Fleur</u> decision, the case addressing Hobbs Act robbery, has been called into question by a recent order granting a motion for a certificate of appealability.  [Doc. 152 at 7].  While I appreciate Defendant's arguments, I am constrained to apply the law as it currently stands.  Because the Eleventh Circuit has unambiguously held that the predicate offenses for the three § 924(c) counts charged against Defendant in this case are crimes of violence pursuant to § 924(c)(3)(A), I recommend that Defendant's motion to dismiss Counts Two, Four, and Six [Doc. 152] be DENIED.

**D.    Renewed Motion to Suppress Cell Site Data and Other Evidence Collected Pursuant to the Stored Communications Act [Doc. 164]**

On July 12, 2017, Defendant filed a Motion to Suppress Cell Site Data and Other Evidence Collected Pursuant to the Stored Communications Act, arguing that documents and records obtained from third parties under the Stored Communications Act, 18 U.S.C. § 2701, <u>et seq.</u>, should be suppressed because they were obtained without a warrant.  [Doc. 21].  On August 15, 2017, this Court denied the motion based on the binding precedent articulated in <u>United States v. Davis</u>, 785 F.3d 498 (11th Cir. 2015), in which the Eleventh Circuit held that obtaining documents and records from third parties under the Stored Communications Act does not amount to a search under the Fourth Amendment. [Doc. 43].

53

On June 22, 2018, the Supreme Court issued its decision in <u>Carpenter v. United States</u>, concluding that the acquisition of historical cell site records does indeed constitute a search within the meaning of the Fourth Amendment and that, generally speaking, law enforcement must obtain a warrant supported by probable cause before acquiring such records.  <u>See</u> 138 S.Ct. 2206, 2220–21 (2018).

After <u>Carpenter</u> was decided, the Eleventh Circuit ruled in <u>United States v. Joyner</u> that if the prosecutors and officers acted in good faith in obtaining cell site data without a warrant before the <u>Carpenter</u> decision was issued, then the good faith exception to the exclusionary rule articulated in <u>United States v. Leon</u>, 468 U.S. 897, 922 (1984) may apply.  <u>See United States v. Joyner</u>, 899 F.3d 1199, 1204–05 (11th Cir. 2018) (relying on <u>Leon</u> to conclude that the district court's denial of a motion to suppress based on the Government's failure to obtain a search warrant for cell site data did not constitute reversible error).

In this case, the Government argues that the prosecutor who requested the orders authorizing the disclosure of historical cell site data was relying in good faith on the <u>Davis</u> decision, in which the Eleventh Circuit held that a court order under the Stored Communications Act was the proper way to obtain such information.  [Doc. 175 at 5].  According to the Government, the prosecutor's actions were taken in good faith, and therefore, <u>Leon</u> should apply.  Defendant has

presented no argument or evidence to counter that proposition.  Instead, Defendant argues simply that <u>Leon</u> should not apply, that <u>Joyner</u> was wrongly decided, and that "the legal landscape on this issue is changing."  [Doc. 183 at 3–4].

The fact that the law in this area is developing does not change the fact that in obtaining the cell site data in this case, the prosecutor complied with the requirements of the Stored Communications Act and that when she did so in November 2016 [Doc. 175-1] and January 2017 [Doc. 175-2], her actions were in compliance with the Fourth Amendment, as interpreted by the Eleventh Circuit at that time.  The reasoning of <u>Joyner</u> applies in this case.  Because there is no evidence of bad faith, I conclude that it is appropriate to apply the <u>Leon</u> good faith exception to the exclusionary rule to the cell site data in this case, despite the fact that it was acquired without a warrant.  Accordingly, I recommend that the Renewed Motion to Suppress Cell Site Data and Other Evidence Collected Pursuant to the Stored Communications Act [Doc. 164] be DENIED.[11]

---

[11]  Defendant also complains that the Government did not timely turn over the two applications and orders for the historical cell site data.  According to Defendant, the first time Defendant received them was as an attachment to the Government's response to this motion.  [Doc. 183 at 1].  Defendant asks the Court to exclude the cell site data based on this egregious discovery violation.  This is not the first complaint I have heard from defense counsel in this case regarding the Government's compliance (or lack thereof) with its discovery obligations.  While I have not delved deep into the discovery problems, I am aware that there have been

### III.   <u>CONCLUSION</u>

For the reasons stated, I **RECOMMEND** that all the motions discussed herein [Docs. 22, 35, 36, 41, 106, 119, 127, 128, 136, 152, 164] be **DENIED**. I have now addressed all referred pretrial matters and have not been advised of any impediments to the scheduling of a trial. Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**SO REPORTED AND RECOMMENDED**, this 9th day of October, 2018.

CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE

---

certain shortcomings regarding the manner in which discovery has been produced. Nevertheless, while I am sympathetic to the frustration that defense counsel feels, I hereby exercise my discretion to DENY the request to exclude the evidence based on the timing of the Government's production of it.