UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

LENARD GIBBS,

    Defendant.

CRIMINAL ACTION NO.
  1:17-CR-00207-CAP-CMS-1

## O R D E R

Before the court is the magistrate judge's report and recommendation ("R & R") that eleven of defendant Lenard Gibbs' pretrial motions be denied [Doc. No. 195]. The defendant timely filed objections [Doc. No. 201], and the R & R is now ripe for review by this court.

## I.   Background

The defendant is charged with a Hobbs Act robbery and brandishing a firearm during a crime of violence related to the November 3, 2016 robbery of a LoanMax in Norcross, Georgia (counts one and two); bank robbery and brandishing a firearm during a crime of violence related to the November 3, 2016, robbery of a PNC Bank in Lilburn, Georgia (counts three and four); bank robbery and brandishing a firearm during a crime of violence related to the November 28, 2016 robbery of a People's Bank in Conyers, Georgia (counts five and six); and being a felon in possession of a firearm on

December 2, 2016, the date he was arrested (count seven). He filed the

following motions relating to these charges which are presently before the

court:

1. Motion to suppress evidence seized during the warrantless searches of his residence and his vehicle [Doc. No. 22];

2. Amended motion to suppress evidence seized during the warrantless search of the Saturn vehicle he was driving at the time of his arrest [Doc. No. 35];

3. Amended motion to suppress evidence seized during the warrantless search of 396 Westwood Place, Apartment 6, Austell, Georgia [Doc. No. 36];

4. Motion to suppress evidence seized as a result of his warrantless arrest or in connection with an invalid arrest warrant [Doc. No. 41];

5. Amended motion to exclude out-of-court and in-court eyewitness identifications, request for hearing, and request for *Brady* material [Doc. No. 106];

6. Motion to exclude the identification of the defendant by Benita Alveranga [Doc. No. 119];

7. Motion to exclude the identification of the defendant by Kyrie Campbell [Doc. No. 127];

8. Motion to exclude the identification of the defendant by Miles Butler [Doc. No. 128];

9. Motion to exclude the identification of the defendant by United States Probation Officer Jason Griffith [Doc. No. 136];

10. Motion to dismiss counts two, four, and six [Doc. No. 152];

11.   Renewed motion to suppress cell site data and other evidence collected pursuant to the Stored Communications Act [Doc. 164].

The R & R recommended the court deny all of the defendant's motions. The defendant objected to all of these recommendations except the recommendation to deny the motion to exclude the identification by Benita Alveranga [Doc. No. 119] as moot. Accordingly, the court will review the recommended denial of that motion for plain error, and every other recommendation *de novo*.

## II.   Legal Analysis

### A.   Motions to suppress based on the Fourth Amendment

#### 1.   The defendant's motion to suppress evidence obtained as a result of his arrest [Doc. No. 41]

The defendant challenged his December 2, 2016, arrest—and sought to exclude evidence seized because of that arrest—based on the validity of the arrest warrants. While the R & R noted there were serious deficiencies with the warrants, it did not determine their validity. Instead, the R & R held that the facts and circumstances within the collective knowledge of law enforcement at the time of the defendant's arrest were sufficient to establish probable cause to believe the defendant committed one or more armed robberies. The defendant objects to this ruling, claiming that the information used by law enforcement to establish probable cause is unreliable and that

the only facts known to the arresting officers when they stopped the defendant on December 2, 2016, were claims that there were valid arrest warrants issued for the defendant.

"Probable cause to arrest exists where the facts and circumstances within the collective knowledge of law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." *United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002) (quoting *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992)). For the collective knowledge of the group to be imputed to the officer who conducts the stop or makes the arrest, the government must show that the officer "maintained at least a minimal level of communication during [the] investigation." *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985). Clearly this requires a two-step inquiry. First the court must determine whether the surveillance team trailing the defendant had the requisite collective knowledge to establish probable cause. Then it must determine if Officer Moore of the Cobb County Police Department—the officer who conducted the stop by applying the PIT maneuver to the car the defendant was driving—maintained at least minimal communication during the investigation with the surveillance team.

### i. The surveillance team's collective knowledge at the time of the arrest

At the time Officer Moore conducted the stop, the surveillance team—

which consisted of FBI Special Agents Charles and Henriques and two

members of the Conyers Criminal Investigation Division, Sergeant Lucas and

Detective Williams—collectively knew the following:

- Benita Alveranga, an alleged accomplice in the PNC Bank robbery, was unable to identify the defendant as the robber but stated that the individual in the surveillance photos robbing the PNC Bank was the same individual who was in the car with her and Kyrie Campbell on November 3, 2016 [Doc. No. 135 at 133–35; Doc. No. 159 at 63–68].

- Kyrie Campbell, an alleged accomplice and getaway driver in the PNC Bank robbery, stated that the defendant (with whom Campbell was previously acquainted) robbed the PNC Bank on November 3, 2016 [Doc. No. 159 at 34–42, 55–59].

- The defendant's probation officer identified the defendant by voice, with 90% certainty, as the individual who committed the LoanMax robbery on November 3, 2016 after viewing the surveillance footage [Doc. No. 135 at 140–41].

- C.C., one of the victims of the LoanMax robbery, picked the defendant out of a photo array with 80% certainty as the individual who robbed the LoanMax on November 3, 2016 [Doc. No. 135 at 140].

- Miles Butler, an alleged accomplice and getaway driver in the People's Bank robbery, stated that the defendant (with whom Butler was previously acquainted) robbed the People's Bank on November 28, 2016 [Doc. No. 159 at 71–77].

- Law enforcement received a crime stoppers tip from the defendant's girlfriend that the defendant, who was a suspect in the LoanMax, PNC

Bank, and People's Bank robberies, was staying at 396 Westwood Place, Austell, Georgia and may be driving a dark colored Saturn [Doc. No. 135 at 98–100].

- Multiple arrest warrants, including a federal probation violation warrant, had been issued for the defendant [Doc. No. 135 at 99].

The defendant contends this information is not reliable because all the identifications of the defendant as the robber are statements made by co-defendants trying to minimize their own involvement. But this position ignores the identification of the defendant by his probation officer and C.C., one of the victims of the LoanMax robbery. Also, the court is not convinced that the co-defendants were trying to minimize their own involvement in the robberies when they identified the defendant. Campbell and Butler both admit they were the wheelmen in their respective robberies, and the surveillance footage from all three businesses shows that a lone gunman— who is neither Butler nor Campbell—committed the robberies. So while Campbell, Butler, or Alveranga (who was a passenger for the PNC Bank robbery) may try to plead ignorance that the robbery was going to occur, police never actually suspected that any of them were the armed individual who entered the bank, brandished a weapon, and physically carried away the money. So pointing the finger at the defendant as the gunman in no way minimizes their own role in the crimes, as this was never in dispute.

The defendant also claims that the tip by Stacy Redwine (the defendant's pregnant girlfriend who called in the crime stoppers tip) is not helpful in establishing probable cause because Redwine never specifically said he was the robber when calling in the tip. While the crime stoppers tip was invaluable in determining where to set up surveillance, the court disagrees with the defendant's assertion that it has no value in establishing probable cause. When Redwine called in the crime stoppers tip, she did so in response to a report that her boyfriend was wanted for armed robbery. Even if she did not explicitly state during the call that the defendant committed the robberies, tipping law enforcement to her boyfriend's whereabouts after learning he is wanted for bank robbery implies that something led her to believe he committed the robberies. While her tip is insufficient, alone, to establish probable cause, it is certainly probative on this issue.

After looking at the collective knowledge of law enforcement at the time of the arrest—which includes four eyewitness identifications, one voice identification, and a tip from the defendant's own girlfriend turning him in for the People's Bank robbery— the court finds there was probable cause to arrest the defendant.

### ii. Officer Moore's communication with the surveillance team prior to stopping the defendant

This leads the court to its second inquiry: whether Officer Moore maintained at least minimal communication with the surveillance team during the investigation so that their collective knowledge—which establishes probable cause—can be imputed to him. Sergeant Lucas, a member of the surveillance team, testified that the surveillance team observed the defendant and Redwine leave their apartment, get in her car, and go into a gas station convenience store [Doc. No. 135 at 17–18]. Once they pulled out of the gas station, Sergeant Lucas—who was already on the phone with Agent Charles, who was in a second vehicle—used a second cell phone to contact the Cobb County Police Department Patrol Division, advise that they were surveilling a suspected serial bank robber, and request assistance in conducting a traffic stop [Doc. No. 135 at 19]. Sergeant Lucas was placed in contact with Sergeant Latham—the on-duty supervisor for the Cobb County Police Department—and remained on the phone with him until Officer Moore conducted the stop on the defendant [Doc. No. 135 at 19]. During this time, Sergeant Lucas informed Sergeant Latham that she, her partner, and two FBI Agents were pursuing a serial armed robber with active felony warrants who was known to be armed and dangerous [Doc. No. 135 at 48]. Sergeant

Latham immediately radioed this information—in real time while still on the phone with Sergeant Lucas—out to all his units and Cobb County dispatch to facilitate the felony stop of the defendant [Doc. No. 135 at 49]. Officer Moore heard Sergeant Latham's radio call relaying this information [Doc. No. 135 at 58–59]. Based on this information—and while maintaining constant radio contact with Sergeant Latham and Cobb County dispatch—Officer Moore initiated the felony stop of the defendant and, after a short car chase, executed the PIT maneuver which incapacitated the defendant's vehicle [Doc. No. 135 at 61–65].

The defendant argues the surveillance team's collective knowledge should not be imputed to Officer Moore because he received all his information from Sergeant Latham, not directly from the surveillance team. But the defendant offers no law supporting his contention that Officer Moore must have had direct radio contact with Sergeant Lucas, and the court fails to see the difference. Because Sergeant Latham was in constant contact with the surveillance team and simultaneously relayed any information he received to Officer Moore—and every other officer on patrol—there was at least minimal communication between Officer Moore and the surveillance team. *See, e.g. United States v. Hernandez*, 17 F. Supp. 3d 1255, 1260 (N.D. Ga. 2014) (where Homeland Security agents were in contact with a Douglas

County police officer, and that officer directed another Douglas County police officer to conduct a stop, there was sufficient communication to impute the agents' collective knowledge to the arresting officer, albeit through an intermediary law enforcement officer).

The defendant also claims that because Officer Moore was not aware of the underlying facts of the defendant's alleged crimes, the stop was improper. And he cites informant cases—which do require the disclosure of credible underlying facts to the officer prior to an arrest—to support this proposition. But this argument overlooks the basic principal behind the imputed knowledge doctrine. If Officer Moore was aware of the underlying facts, the surveillance team's knowledge would not need to be imputed to him to establish probable cause. And the law is clear that the arresting officer does not need to know the basis for the probable cause before the knowledge of other law enforcement officers can be imputed to him. The fact that the defendant was a suspected serial bank robber with active warrants was sufficient. *United States v. Kapperman*, 764 F.2d 786, 791 n.5 (11th Cir. 1985) (finding the arresting officer "was entitled to act on the strength of the radio communication directing him to 'stop the vehicle and secure the scene'") (citing *Whiteley v. Warden*, 401 U.S. 560 (1971)); *United States v. Rodriguez-Alejandro*, 664 F. Supp. 2d 1320, 1335 (N.D. Ga. 2009) (being told that the

vehicle was suspected of carrying drugs was enough for an officer unconnected with the investigation to conduct the stop).

Based on this analysis, the court finds that the facts and circumstances within the collective knowledge of the surveillance team at the time of the arrest were sufficient to establish probable cause to believe the defendant committed one or more armed robberies. The court further finds that Officer Moore maintained at least a minimal level of communication with the surveillance team. The defendant's motion to suppress evidence gathered as a result of his arrest [Doc. No. 41] is DENIED.

## 2. The defendant's motion to suppress evidence obtained because of the search of Stacy Redwine's car [Doc. Nos. 22, 35]

The next issue is whether the search of the Saturn violated the Fourth Amendment's prohibition on unreasonable searches and seizures. The R & R found that the defendant abandoned any expectation of privacy he had in Redwine's car when he fled the vehicle on foot, and that without an expectation of privacy he does not have standing to challenge the search. The R & R further found that, even if the defendant had standing to challenge the search, Redwine's testimony that she did not consent to the search was not credible and that Special Agent Henriques's testimony that Redwine gave consent was credible. The defendant objects to both of these conclusions,

arguing that because the defendant left the vehicle in Redwine's care he did not abandon his expectation of privacy, that Redwine did not consent to the search, and that she lacked the capacity to consent.

The critical inquiry when determining if abandonment has occurred is "whether the person prejudiced . . . voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question." *United States v. Ramos*, 12 F.3d 1019, 1022 (11th Cir. 1994). Courts apply an objective standard, gauging the prior possessor's intent, "as discerned from statements, acts, and other facts." *United States v. Sparks*, 806 F.3d 1323, 1342 (11th Cir. 2015). In doing so, the court must consider "[a]ll relevant circumstances existing at the time of the alleged abandonment." *Id.* "Police pursuit or the existence of a police investigation does not of itself render abandonment involuntary." *Id.* (citation omitted). In making this inquiry, courts have emphasized that the issue of abandonment for Fourth Amendment standing purposes is not abandonment in the 'strict property-right sense.' Rather, we use a 'common sense approach' in evaluating abandonment." *Id.* (quoting *United States v. Edwards*, 441 F.2d 749, 753 (5th Cir. 1971)).

The facts surrounding the defendant's abandonment of the vehicle are not in question. First, Officer Moore executed the PIT maneuver, causing the

vehicle to spin out and blow a tire [Doc. No. 135 at 64–65]. The defendant

immediately climbed over Redwine, exited the vehicle through the passenger

door, and began running [Doc. No. 135 at 65]. The defendant then led Officer

Moore on a foot chase through the parking lot, between apartment buildings,

and up a hill, before momentarily escaping by jumping a fence [Doc No. 135

at 65–67].

As the R & R shows, there is a significant amount of binding precedent

establishing that when defendants flee on foot after the stop of a vehicle, they

abandon their privacy interest in that vehicle (Doc. No. 195 at 26–28].[1] But

the court is cognizant of (and appreciates) the defendant's unique argument

that, by leaving the vehicle in the possession of its lawful owner, he was not

abandoning the vehicle. However, the Supreme Court's reasoning in *Katz*

that "the Fourth Amendment protects people, not places" is particularly

instructive here. *Katz v. United States*, 389 U.S. 347, 351 (1967). Redwine, by

remaining in the vehicle, maintained her expectation of privacy in the

vehicle. But when the defendant removed himself from the vehicle and fled

---

[1] Several of our sister circuits have reached the same conclusion. *See, e.g.*,
*United States v. Smith*, 648 F.3d 654, 660 (8th Cir. 2011); *United States v.
Vasquez*, 635 F.3d 889, 892, 894 (7th Cir. 2011); *United States v. Walton*, 538
F.2d 1348, 1351, 1354 (8th Cir. 1976); *United States v. D'Avanzo*, 443 F.2d
1224, 1225–26 (2d Cir. 1971).

through the parking lot, in between buildings, and over the fence, his Fourth Amendment protections accompanied him. Because the defendant did not have a reasonable expectation of privacy in the vehicle at the time of the search, he does not have standing to challenge the search, and his motions to suppress evidence based on an improper search of the vehicle [Doc. Nos. 22, 35] are DENIED.

### 3. The defendant's motion to suppress evidence obtained from the search of the apartment [Doc. Nos. 22, 36]

The next issue is whether the search of Redwine's apartment, which she shared with the defendant, violated the Fourth Amendment's prohibition on unreasonable searches and seizures. The R & R held that law enforcement obtained voluntary consent from Redwine to search the apartment. The defendant argues that Redwine was coerced and therefore unable to consent to the search of the apartment, and that even if she was able, she never consented to a general search of the apartment and was instead deceived into thinking that the officers were going to search only for the defendant.

### a. Redwine's capacity to consent

First, the court must determine whether Redwine had the capacity to consent to a search of their apartment. "[T]he Fourth ... Amendment[ ] require[s] that a consent not be coerced, by explicit or implicit means, by

implied threat or covert force." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). "For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Id. See also United States v. Yeary*, 740 F.3d 569, 581–82 (11th Cir. 2014). Whether consent is voluntary is a fact question determined according to the totality of the circumstances. *Johnston v. Tampa Sports Auth.*, 530 F.3d 1320, 1326 (11th Cir. 2008).

Once again, the facts before the court are not disputed. At the end of the car chase law enforcement ordered Redwine, at gunpoint, to get on the ground, where she was handcuffed and searched before being placed in the back of a police car [Doc. No. 135 at 156–57]. Once officers placed Redwine in the police cruiser they removed her handcuffs [Doc. No. 135 at 25–26]. She sat there for a few to several minutes until Agent Henriques—who spoke with Redwine and eventually obtained her consent to search the apartment— arrived [Doc. No. 135 at 26]. Redwine testified that when she was ordered onto the ground, handcuffed, searched, and placed in the police cruiser, she was crying, hysterical, and scared [Doc. No. 135 at 157]. Sergeant Lucas agreed that, prior to the removal of the handcuffs, Redwine seemed "pretty upset" [Doc. No. 135 at 25]. But once law enforcement removed her handcuffs

and she began talking with Agent Henriques, both Sergeant Lucas and Agent Henriques testified that she calmed down [Doc. No. 135 at 26, 106]. Agent Henriques further testified that during his conversation with Redwine his gun was hidden from view, he never threatened her, touched her, or made any promises to gain her cooperation [Doc. No. 135 at 106–108].

The defendant claims that it is clear Redwine felt compelled to comply with the officer's requests because she was detained and could not leave when the consent was requested. But the fact that an individual is lawfully detained does not negate their ability to voluntarily consent to a search. The Eleventh Circuit has found consent to be voluntary where 14 police officers were present at a defendant's house, they arrested and handcuffed him, and then refused to accept the defendant's conditional consent to search only the part of the house, stating they would instead obtain a search warrant unless the defendant consented to a full search. *See United States v. Garcia*, 890 F.2d 355, 360–62 (11th Cir. 1989). Still another case that supports the conclusion that Redwine's consent in this case was voluntary is *United States v. Espinosa–Orlando*, where the defendant was pulled over by officers on suspicions that he was transporting drugs. 704 F.2d 507, 510 (11th Cir. 1983). With guns drawn, four officers ordered the defendant to get out of his car and lie on the ground. *Id.* Three of the officers holstered their guns while

the other pointed the gun elsewhere; then one of the officers asked for the defendant's consent to search the car. *Id.* at 513. The defendant consented, and the court held that the consent was voluntary and uncoerced. *Id.*

Based on the record, the court finds that the defendant has not carried his burden to show that Redwine's consent was coerced. But this does not end the inquiry. The court must now determine whether Redwine consented to a general search of the entire apartment—as the government claims—or whether she agreed only to let officers search the apartment for the defendant.

### b. The scope of Redwine's consent

The consent-to-search form Redwine signed indicated she voluntarily gave law enforcement permission to conduct a "complete search" of the apartment after being advised of her right to refuse [Doc No. 132-1 at 6]. Agent Henriques testified that he read the consent form to Redwine "verbatim" and explained that they would be looking for items relating to the robberies [Doc. No. 135 at 105]. Conversely, Redwine testified at the hearing that she thought the police were going to the apartment only to see if the defendant was there. But she also testified she couldn't remember the actual conversation with Agent Henriques, exactly what Agent Henriques said they would be looking for in the apartment, or what the consent-to-search form

actually said [Doc. No. 135 at 158–59]. And when Redwine returned to the apartment later that day, it was still being searched by law enforcement. Yet she never objected or revoked her consent, testifying that once she arrived officers gave her a list of items they took into evidence and "that was it" [Doc. No. 135 at 160].

Based on the unambiguous consent form, Agent Henriques testimony indicating he informed Redwine that law enforcement wanted to conduct a general search of the apartment, and Redwine's inability to remember what Agent Henriques said they would be looking for in the apartment, the court finds Redwine voluntarily consented to a general search of the entire apartment, which she sometimes shared with the defendant. The defendant's motions to suppress evidence based on an improper search of the apartment [Doc. Nos. 22, 36] are DENIED.

### 4. The defendant's renewed motion to suppress cell-site data and other evidence collected under the Stored Communications Act [Doc. No. 164]

The R & R also denied the defendant's motion to suppress the cell-site data collected without a warrant under the Stored Communications Act. The defendant claims this violated his Fourth Amendment rights, pointing to *Carpenter v. United States*, which held that the collection of cell-site data constituted a search under the Fourth Amendment. 138 S. Ct. 2206, 2220–21

(2018). The R & R explains that the cell-site data in this case was collected

prior to the Supreme Court's holding in *Carpenter*,  and that post-*Carpenter*

Eleventh Circuit precedent establishes that if the prosecutors and officers

acted in good faith when obtaining cell-site data without a warrant before the

*Carpenter* decision was issued, then the good-faith exception to the warrant

requirement articulated in *United States v. Leon*[2] may apply. *See United*

*States v. Joyner*, 899 F.3d 1199, 1204–05 (11th Cir. 2018) (relying on *Leon* to

conclude that the district court's denial of a motion to suppress based on the

Government's failure to obtain a search warrant for cell-site data did not

constitute reversible error).

The court agrees that this situation fits within the *Leon* good-faith

exception to the exclusionary rule as established in *Joyner*. The cell-site data

was collected pre-*Carpenter*, and at that time binding precedent in this

Circuit established that obtaining documents and records from third parties

under the Stored Communications Act was not a search under the Fourth

Amendment. *See U.S. v. Davis*, 785 F.3d 498 (11th Cir. 2015). Because law

enforcement had a good-faith reason to believe they were not conducting a

search under the Fourth Amendment, the *Leon* exception applies, and the

---

[2] 468 U.S. 897, 922 (1984)

defendant's motion to suppress cell-site data and other evidence collected pursuant to the Stored Communications Act [Doc. No. 164] is DENIED.

## B. Motions to suppress the out-of-court identifications of the defendant

The defendant also moved to suppress five out-of-court identifications, alleging the procedures used by law enforcement to obtain these identifications violated due process. Due process prohibits witnesses from testifying about out-of-court identifications when there is a very substantial likelihood of misidentification. *Neil v. Biggers*, 409 U.S. 188, 198 (1972). A violation of due process occurs when, under "the totality of the circumstances," a confrontation procedure is "unnecessarily suggestive and conducive to irreparable mistaken identification." *Simmons v. United States*, 390 U.S. 377, 384 (1968); *see also Perry v. New Hampshire*, 565 U.S. 228, 238–39 (2012) ("[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary."). If the identification procedure was not unduly suggestive, this "ends the inquiry" and the evidence may be admitted. *Williams v. Weldon*, 826 F.2d 1018, 1021 (11th Cir. 1987).

But if the procedures used were unduly suggestive, the court then considers whether, under the totality of the circumstances, "the identification

was nonetheless reliable." *United States v. Brown*, 441 F.3d 1330, 1350 (11th Cir. 2006). Courts evaluate several factors to determine reliability: (1) the opportunity of the witness to view the criminal; (2) the degree of attention; (3) the accuracy of a prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. *See Biggers*, 409 U.S. at 199–200; *Perry*, 565 U.S. at 239 n. 5. The defendant bears the burden of proving that the identification procedure used was "so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification," *see Albert v. Montgomery*, 732 F.2d 865, 871 (11th Cir.1984), and only after the defendant meets this burden must the government show the identification was reliable independent of the suggestive procedure.

1. **Motion to suppress the identification of the defendant by C.C. [Doc. No. 106]**

C.C, a LoanMax employee present during the November 3, 2016 robbery, picked the defendant out of a photo array as the individual who robbed the LoanMax. The R & R held that, although there was conflicting testimony about whether Detective Baker (who was investigating the LoanMax robbery) or Officer Fitzpatrick (who was unaffiliated with the investigation) presented the photograph array to C.C., there was nothing to

indicate that either the photo array or the procedures that the officers used were unduly suggestive. The defendant objects to this finding, claiming that Detective Baker's knowledge that the defendant was the suspect when he conducted the photo array and the differences in his recollection of events from C.C.'s make the identification unduly suggestive and unreliable. The defendant further argues that because Detective Baker provided C.C. with post-identification feedback that they arrested the suspect she identified, C.C. should not be allowed to make an in-court identification of the defendant.

Specifically, the defendant claims the procedure used when C.C. identified him was unduly suggestive because (1) Detective Baker, who was involved in the investigation, presented the photo array; and (2) it is "likely" Detective Baker told C.C. that the LoanMax suspect was probably the same individual who robbed the PNC Bank (according to the defendant, news coverage of the PNC Bank robbery included photographs of him).[3] The testimony is certainly muddled regarding who showed C.C. the photo array.

_____

[3] The defendant also sets forth an unsupported theory that Detective Baker met with C.C., alone, after the day of the robbery but before the photo array. To the extent this is done to suggest the lineup procedure was unduly suggestive, C.C. testified that her first interaction with law enforcement after November 3, 2016—the day of the robbery—was when officers presented her with the photo array [Doc. No. 166 at 70].

While everyone agrees that there was one black and one white officer present in the LoanMax, C.C. testified that a black officer—presumably Detective Baker—showed her the array, while Officer Fitzpatrick (who is white) testified that he showed C.C. the array. But even if Detective Baker—who knew the defendant was the suspect at the time of the identification—showed C.C. the photo array, that does not necessarily mean the procedure was unduly suggestive. To prevail, the defendant must show law enforcement did something to convey his identity to C.C. *See United States v. Stevenson,* No. 1:11-CR-00350-ODE, 2012 WL 1424169, at *3–4 (N.D. Ga. Mar. 7, 2012), *report and recommendation adopted*, No. 1:11-CR-350-ODE-RGV, 2012 WL 1418635 (N.D. Ga. Apr. 23, 2012) (upholding identification where FBI agent involved in the investigation and who knew the identity of the suspect presented robbery victims with a photo array containing the suspect but did nothing to emphasize the photograph of the suspect); *Robinson v. Tucker*, No. 3:10CV101 RV/MD, 2012 WL 1192140, at *19 (N.D. Fla. Mar. 2, 2012), *report and recommendation adopted*, No. 3:10CV101 RV/MD, 2012 WL 1192130 (N.D. Fla. Apr. 9, 2012) (upholding identification where detective involved in the investigation presented shooting victim with a photo array containing the suspect but did nothing to emphasize the photograph of the suspect).

The only thing the defendant accuses Detective Baker of doing to suggest the defendant's identity is the unsupported assertion that he "likely" informed C.C. that the suspect in the LoanMax robbery was the same individual who robbed the PNC Bank. And the defendant claims the news coverage of the PNC Bank robbery identified him as the suspect and included pictures of him, which could have influenced C.C.'s identification once she knew the suspects were one and the same. The problem with this theory is that C.C. testified Detective Baker never talked with her about any other robberies [Doc. No. 166 at 72–73]. In fact, when C.C. identified the defendant she didn't even know there had been another robbery on the same day as the LoanMax robbery [Doc. No. 166 at 73].

Based on this testimony, the court finds that even if Detective Baker presented the photo array to C.C., there is no evidence indicating he suggested which photograph C.C. should choose. Because the identification procedure was not unduly suggestive, this ends the court's inquiry and it need not address the defendant's arguments on the reliability of the identification. *See Williams*, 826 F.2d at 1021. The defendant's motion to suppress C.C.'s out-of-court identification [Doc. No. 106] is DENIED, assuming that she testifies at trial and is subject to cross examination.

The defendant also moved to suppress any identifications of the defendant made by the second victim of the LoanMax robbery, "H.C." At the evidentiary hearing, the government indicated that H.C. did not identify the defendant and agreed that it would not seek to introduce any identification testimony from that witness at trial [Doc. No. 159 at 7; Doc. No. 133-1 at 1]. The portion of the motion regarding the out-of-court identification by H.C. [Doc. No. 106] is DENIED AS MOOT.

## 2. Motion to suppress the identification of the defendant by Kyrie Campbell [Doc. No. 127]

Another one of the individuals to identify the defendant was Kyrie Campbell, an alleged accomplice in the PNC Bank robbery. The R & R held the procedures employed by police to obtain Campbell's identification were unduly suggestive because the identification was done using a single photograph. But the R & R further found that because Campbell identified the defendant—whom he knew personally—before he was shown any photographs and before he was interviewed by Special Agent Charles, the identification was nonetheless reliable. The defendant objects, claiming that Campbell's unduly suggestive identification was not otherwise reliable because Campbell did not identify him by name before law enforcement showed Campbell a picture of the defendant. Essentially, the defendant takes

the position that law enforcement preemptively identified him as a suspect and simply used Campbell to corroborate their suspicions.

It is undisputed that Campbell identified the defendant by looking at a single photograph law enforcement downloaded from his Facebook account—not from a typical photo array containing multiple individuals. The parties seem to agree that the law in this Circuit establishes that, under the circumstances, this is an unduly suggestive procedure. *See United States v. Cannington*, 729 F.2d 702, 711 (11th Cir. 1984); *United States v. Jean*, 315 Fed. App'x. 907, 912 (11th Cir. 2009). Therefore, the government must establish the identification is otherwise reliable and show that Campbell, prior to being shown the photograph of the defendant, identified him by name as the robber.

Based on the record, the court finds that it is unclear whether Campbell identified the defendant before or after the unduly suggestive lineup. First, Officer Turner of the Lilburn Police Department testified that while waiting in the precinct breakroom—and before being shown any photographs—Campbell made an unsolicited statement identifying the defendant as the robber. The defendant claims that "Officer Turner repeated this story from Lt. Dusik," arguing that Officer Turner did not actually witness Campbell's identification of the defendant [Doc. No. 201 at 16]. In

reality, Officer Turner testified that when Campbell spontaneously identified the defendant "I was sitting next to Lieutenant Allen. Lieutenant Allen took all that information and told and advised Lieutenant Dusik of it all." [Doc. No. 159 at 34–35]. Clearly, Officer Turner was present and testified based on first-hand knowledge when he stated Campbell identified of the defendant before being shown any Facebook photographs of the defendant.

But the defendant also cites testimony from an evidentiary hearing in Campbell's case, where Lieutenant Allen states that he did not remember Campbell identifying the defendant by name before law enforcement showed Campbell the Facebook photographs of the defendant [Doc. No. 151 at 34]. Lieutenant Allen's inability to remember who first mentioned the name Lenard Gibbs is not dispositive. But given Officer Turner's testimony that Lieutenant Allen is the one who noted Campbell's pre-photo-array identification of the defendant and relayed it to Lieutenant Dusik, it is at least concerning.

Finally, the defendant points to the audio recording of Campbell's interview, where Campbell says "I'm just glad I looked at Facebook earlier because I didn't even remember his name. At all." This portion of the interview is conspicuously skipped over in the video recording, due to an apparent "glitch." But after reviewing the audio, the court agrees that

Campbell states "I'm just glad I looked at Facebook earlier because I didn't even remember his name. At all." when identifying the defendant.

Based on this conflicting testimony, Campbell's statement about looking at Facebook before making the identification, and the defendant's pending motion to reopen the suppression hearing on Campbell's identification [Doc. No. 202] the court will DEFER its ruling on the defendant's motion to suppress Campbell's out-of-court identification of the defendant [Doc. No. 127].[4]

### 3. Motion to suppress the identification of the defendant by Benita Alveranga [Doc. No. 119]

Benita Alveranga, Campbell's girlfriend and a passenger in the car during the PNC bank robbery, was not able to identify the defendant as the bank robber. But she did identify the individual in the PNC Bank surveillance video as the same individual who was in the vehicle with her and Campbell. The magistrate judge saw no basis to exclude the evidence

---

[4] Since Campbell's trial been severed from the defendant's trial, evidence of this identification is unable to be admitted against the defendant. *See Bruton v. United States*, 391 U.S. 123, 126 (1968). If Campbell testifies at the defendant's trial, the court can conduct a hearing at that time as to the reliability of the identification. It is noted that Campbell knew the defendant prior to the robbery and it is alleged that both Campbell and the defendant participated in the robbery together.

that Alveranga believed that whoever robbed the PNC Bank was also the person who was in her car, and the defendant has not objected to this finding.

The court agrees that Alveranga did not identify the defendant as the bank robber. And it also finds no reason to exclude her testimony that whoever was in the car with her on November 3, 2016 at the PNC Bank is the same individual in the PNC Bank surveillance footage she was shown by law enforcement. Because Alvaranga did not make a positive identification, the defendant's motion to exclude the out-of-court identification by Benita Alveranga [Doc. No. 119] is DENIED AS MOOT.

### 4. Motion to suppress the identification of the defendant by Miles Butler [Doc. No. 128]

Miles Butler, the alleged getaway motorcycle driver for the November 28, 2016 People's Bank robbery, identified the defendant as the People's Bank robber. According to Special Agent Charles, Butler admitted he was the getaway driver for the People's Bank robbery and told investigators that the defendant was the robber. Agent Charles then showed Butler pictures of the defendant, and Butler confirmed that the defendant was the individual in the pictures. As discussed above, the use of a single photograph to identify a suspect is unduly suggestive. But the government—just like it did for the Campbell identification—claims Butler's identification of the defendant is

nonetheless reliable because he identified the defendant as the robber before law enforcement asked him to view any photographs.

The defendant claims that Butler's identification is unreliable because, throughout the interrogation, Butler was looking to the officers for guidance or affirmation while also double checking his words with law enforcement before writing on the photographs. In support of his position, the defendant asks this court to view the video of Butler's interrogation in its entirety—something the magistrate judge did not have the opportunity to do prior to the suppression hearing. The court has done so and finds that while Butler is anxious—after all, he is being interrogated by a police detective and FBI agent about a bank robbery—nothing in the video indicates law enforcement was coaching Butler or pressing him to make anything other than a reliable identification. The video also supports the government's position that Butler identified the defendant—whom he knew previously—as the robber very early in the interview and prior to viewing any photographs of the defendant. The defendant's motion to exclude the out-of-court identification by Miles Butler [Doc. No. 128] is DENIED assuming that he testifies at trial and is subject to cross examination.

5.  **Motion to suppress the identification of the defendant by Jason Griffith [Doc. No. 136]**

Jason Griffith, a United States Probation Officer who supervised the defendant at the time of the robberies, identified the defendant as the LoanMax robber based on the robber's voice and, to a lesser degree, body frame and stature. The R & R held that, under Federal Rule of Evidence 901(b)(5), there is sufficient evidence to show that Officer Griffith was familiar with the defendant's voice, so it should be up to the jury to decide the weight to place on his voice identification. The defendant objects, arguing this testimony is akin to an identification, and that the identification procedure was unduly suggestive and unreliable because law enforcement told Officer Griffith that the defendant was the suspect before sending him the video. Further, the defendant points to the brevity of the video and also claims Officer Griffith was inclined to identify the defendant as the robber because he conducted online research into the PNC Bank robbery (another crime where the defendant was the primary suspect).

The R & R correctly points out that FRE 901(b)(5) allows the admission of opinion testimony based on the witness's familiarity with the voice, and that "[o]nce a witness establishes familiarity with an identified voice, it is up to the jury to determine the weight to place on the witness's voice identification." *Brown v. City of Hialeah*, 30 F.3d 1433, 1437 (11th Cir. 1994). While that is true, FRE 901 only helps authenticate the voice on the

LoanMax video. Here the government is using Griffith's identification of the defendant's voice as an identification of the defendant as the LoanMax robber—not merely to authenticate the voice. And because Griffith's identification is an out-of-court statement made to law enforcement implicating the defendant—i.e. a testimonial statement—the defendant's due process rights are implicated and Griffith's identification must pass constitutional muster.

As previously mentioned, binding precedent indicates the use of a single photograph—instead of a photo array—is an unduly suggestive procedure. The court does not see a significant difference between a single photograph of a suspect and a single video depicting the suspect. Additionally, Detective Baker of the Gwinnett County Police Department specifically identified the defendant by name as the suspect when he sent Officer Griffith the surveillance video of the LoanMax robbery [Doc. No. 166 at 46–48], instead of just identifying the suspect as one of Officer Griffith's current or former probationers [Doc. No. 166 at 54–55]. Detective Baker did not provide an admonition prior to sending Officer Griffith the tape, instead just asking "see if you think this is him or not" [Doc. No. 166 at 55]. Based on these circumstances, the court finds the identification procedures used in

procuring Officer Griffith's identification of the defendant were unduly

suggestive.

Because the identification procedures were unduly suggestive, the

government must establish the identification by Officer Griffith is otherwise

reliable based on the totality of the circumstances. Put another way, is there

sufficient evidence to find that Officer Griffith's identification of the

defendant was reliable, independent of the suggestive procedures used to

procure it.[5] Officer Griffith testified that he had 14 "extensive" and "pretty

lengthy" face-to-face interactions with the defendant [Doc. No. 166 at 45].

Officer Griffith also had 11 phone conversations where he spoke "at length"

with the defendant, as well as numerous other, short calls which he did not

document [Doc. No. 166 at 46–47]. His significant interaction with the

defendant weighs in favor of reliability. Additionally, Officer Griffith had the

luxury of examining a video, meaning he could increase the volume, pause,

rewind, and replay the robbery over and over if he was uncertain about the

---

[5] While tailored for eye-witness identifications, the factors identified in *Biggers* to determine reliability are still instructive in analyzing Officer Griffith's voice identification. These factors are (1) the opportunity of the witness to view the criminal; (2) degree of attention; (3) the accuracy of a prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. *See Biggers*, 409 U.S. at 199–200.

robber's identity. In fact, he testified that he watched the video over twenty times [Doc. No. 166 at 59]. This too weighs in favor of reliability. The fact that Officer Griffith was still supervising—and therefore consistently interacting with—the defendant when he watched the video in November 2016 [Doc. No. 166 at 61] also weighs in favor of reliability, as does the fact that Officer Griffith was not aware of the LoanMax robbery before he received the video from Detective Baker [Doc. No. 166 at 57–58]. Officer Griffith also testified that he is "certain" and "really do[es] believe" it is the defendant in the video [Doc. No. 166 at 49].

Based on the totality of the circumstances, the court finds that Officer Griffith's identification of the defendant, while procured through suggestive means, is otherwise reliable. The court further finds that, based on Officer Griffith's testimony, he established his familiarity with the defendant's voice as required by FRE 901(b)(5), and it is up to the jury to determine the weight to place on his voice identification. The defendant's motion to suppress Officer Griffith's out-of-court identification [Doc. No. 136] is DENIED, assuming he testifies and is subject to cross examination.

## C. Motion to dismiss counts two, four, and six [Doc. No. 152]

The defendant was charged with three counts alleging violations of 18 U.S.C. § 924(c), which enhances punishments for any person who uses,

34

carries, possesses, brandishes, or discharges a firearm while committing a "crime of violence." Section 924(c) defines a crime of violence two ways, either as a felony (1) where the use, attempted use, or threatened use of violence is an actual element of the crime, known as the elements clause; or (2) which, by its very nature, involves a substantial risk that physical force, known as the residual or risk-of-force clause.

The R & R held that all three of the predicate offenses for counts two, four, and six—the Hobbs Act robbery and two counts of bank robbery under 18 U.S.C. § 2113(a)—were crimes of violence under the elements clause, which requires that the "use, attempted use, or threatened use of physical force" be an element of the predicate crime. The defendant argues that recent Eleventh Circuit case law shows that none of the charged offenses categorically qualify as a crime of violence under § 924(c)(3)'s elements clause. The defendant further argues that § 924(c)'s residual risk-of-force clause is unconstitutionally vague.

In arguing that § 924(c)(3)'s residual risk-of-force clause—which defines a crime of violence as a felony "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense"—is unconstitutionally vague, the defendant acknowledges the Eleventh Circuit recently held that

this very clause was not unconstitutionally vague because it embodies a conduct-based approach. *Ovalles v. United States*, 905 F.3d 1231, 1252 (11th Cir. 2018) (en banc) ("Accordingly, if § 924(c)(3)(B) is interpreted to embody a conduct-based approach—as we have held it should be—there is no reason whatsoever to doubt its constitutionality.") (quotations omitted). And since the R & R was issued, the Eleventh Circuit reaffirmed its position that § 924(c)(3)(B) is not unconstitutionally vague. *See In re: Tracey Garrett*, No. 18-13680-F (11th Cir. Nov. 2, 2018). So even if *Ovalles* and *Garrett* were decided incorrectly—as the defendant argues—they are binding on this court.

Because § 924(c)(3)(B) is interpreted to embody a conduct-based approach, the jury—if it convicts the defendant—could determine if he committed a crime of violence based on his conduct during the commission of one or more of the robberies. Therefore, the court need not address the defendant's argument that Hobbs Act robbery and federal bank robbery are not categorically crimes of violence under § 924(c)(3)(A), the elements clause. The defendant's motion to dismiss counts two, four, and six [Doc. No. 152] is DENIED.

## III.  Conclusion

Based on the foregoing, the court orders that:

(1)     the motion to suppress evidence seized during the warrantless searches of the defendant's residence and his vehicle [Doc. No. 22] is DENIED;

(2)     the amended motion to suppress evidence seized during the warrantless search of the Saturn vehicle the defendant was driving at the time of his arrest [Doc. No. 35] is DENIED;

(3)     the amended motion to suppress evidence seized during the warrantless search of 396 Westwood Place, Apartment 6, Austell, Georgia [Doc. No. 36] is DENIED;

(4)     the motion to suppress evidence seized as a result of the defendant's warrantless arrest or in connection with an invalid arrest warrant [Doc. No. 41] is DENIED;

(5)     the amended motion to exclude out-of-court and in-court eyewitness identifications, request for hearing, and request for *Brady* material [Doc. No. 106] is DENIED.

(6)     the motion to exclude the identification of the defendant by Benita Alveranga [Doc. No. 119] is DENIED AS MOOT.

(7)     the motion to exclude the identification of the defendant by Kyrie Campbell [Doc. No. 127] is DEFERRED;

(8)     the motion to exclude the identification of the defendant by Miles Butler [Doc. No. 128] is DENIED;

(9)     the motion to exclude the identification of the defendant by United States Probation Officer Jason Griffith [Doc. No. 136] is DENIED;

(10)    the motion to dismiss counts two, four, and six [Doc. No. 152] is DENIED; and

(11)    the renewed motion to suppress cell site data and other evidence collected pursuant to the Stored Communications Act [Doc. No. 164] is DENIED.

The court will hold a pretrial conference for this action on December 13, 2018, at 10:00 a.m. in Courtroom 2307 before the Honorable Charles A. Pannell, Jr.

**SO ORDERED** this 4th day of December, 2018.


/s/ Charles A. Pannell, Jr.
CHARLES A. PANNELL, JR.
United States District Judge